**INTERNATIONAL TELEPHONE AND TELEGRAPH, ITT DEFENSE COMMUNICATIONS DIVISION**

v.

**The UNITED STATES.**

No. 147–70.

United States Court of Claims.

Jan. 21, 1972.

Davis and Nichols, JJ., dissented and filed opinions.

David V. Anthony, Washington, D. C., for plaintiff. Gilbert A. Cuneo, Washington, D. C., attorney of record. Sellers, Conner & Cuneo, Nicholas J. Villarosa, Nutley, N. J., and James J. Gallagher, Washington, D. C., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray III, for defendant.

Before COWEN, Chief Judge, LARAMORE, Judge, DURFEE, Senior Judge, and DAVIS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S ALTERNATIVE CROSS-MOTIONS

SKELTON, Judge.

The facts in this case are not in dispute. They are set forth below as they appear in the plaintiff's petition and in the decision of the Armed Services Board of Contract Appeals (Board), with some additions and changes.

Plaintiff, International Telephone and Telegraph, is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with principal place of business at New York City, New York. ITT Defense Communications is a Division of International Telephone and Telegraph and is located at Nutley, New Jersey. ITT Defense Communications is an administrative successor to ITT Federal Laboratories which executed and performed the subject contract.

Plaintiff brings this action under the general jurisdiction of this court (28 U.S.C. § 1491) for review of an administrative decision under both sections of the so-called Wunderlich Act (41 U.S.C. §§ 321, 322 (1964)).

On June 27, 1966, plaintiff was awarded Contract No. NObsr–95395 for the production of 1193 AN/PRC–41 Portable Transmitter Receivers at a unit price of $2,585 and 657 MK–706/PRC–41 Accessory Kits at a unit price of $750 plus certain maintenance and repair parts. The total estimated contract price was $3,580,956.96.

This contract was awarded under the Multi-Year Procurement alternative of the IFB. As required by ASPR 1–322.5, the contract contained "Limitation of Price and Contractor Obligations" and "Cancellation of Items" clauses. The Limitation of Price and Contractor Obligations clause provided in pertinent part as follows:

\* \* \* \* \* \* ⋅'

\* \* \* (b) Funds are available for performance of this contract in the amount specifically described in the Schedule, as available for contract performance. The amount of funds so described at the time of award is not considered sufficient for the contract performance required by and described in the Schedule for any Program Year other than the First Program Year. Upon availability to the Contracting Officer of additional funds sufficient for performance of the full requirements for the next succeeding Program Year, the Contracting Officer

shall, *not later* than the date specified in the Schedule, unless a later date is agreed to by the parties, so *notify* the contractor *in writing* and the amount of funds described in the Schedule as available for contract performance shall be modified accordingly. This procedure shall apply for each successive Program Year. [Emphasis supplied.]

(d) The contractor is not obligated to incur costs for the performance required for any Program Year after the first unless and until he has been notified *in writing* by the Contracting Officer of an increase in availability of funds in accordance with paragraph (b) of this clause \* \* \*. [Emphasis supplied.]

The "Cancellation of Items" clause provided in paragraph (b):

As used herein, the term "cancellation" means that the Government is cancelling, pursuant to this clause, its Program Year requirements for items as set forth in the Schedule for all Program Years subsequent to that in which notice of cancellation is provided. Such cancellation shall occur only if, within the time period specified in the Schedule, or such further time as may be agreed to, the Contracting Officer (i) notifies the contractor that funds will not be available for contract performance for any subsequent Program Year; or (ii) fails to notify the contractor that funds have been made available for performance of the Program Year requirement for the succeeding Program Year.

Delivery was scheduled for each of four successive Fiscal or Program Years, beginning in Fiscal Year 1966, subject to the provisions set forth above.

The schedule referred to in the above-quoted paragraphs provided:

The clause entitled "Limitation of Price and Contractor Obligations" is modified to specify 15 December 1966 as the date by which the Contracting Officer shall notify the Contractor of the availability of funds for the Fiscal

Year 1967 program; 15 August 1967 for the Fiscal Year 1968 program; and 15 August 1968 for the Fiscal Year 1969 program.

The schedule further provided:

The clause entitled "Cancellation of Items" is supplemented by specifying the following:

(a) The cancellation date referred to in paragraph (b) is 15 December 1966 for the Fiscal Years 1967, 1968 and 1969 program requirements, 15 August 1967 for the Fiscal Year 1968 and 1969 program requirements, and 15 August 1968 for the requirements of the 1969 program.

Defendant notified plaintiff of the availability of funds sufficient for the performance of the Fiscal Year 1967 requirements by sending Change Order (DD 1319), Modification No. 3, dated December 13, 1966, and signed by the contracting officer, R. W. Campbell.

On July 7, 1967, responsibility for administration of the contract was transferred from the Naval Ship Systems Command to the Naval Electronic Systems Command (NAVELEX). Subsequently, the contract negotiator with NAVELEX, who was responsible for ascertaining the availability of funds for the 1968 buy, learned that because one of the using activities no longer needed the contract items additional funds would have to be secured under another Navy project. Because of the paper work and delay in making these funds available, it was not until a few minutes after 4 p. m. on August 15, 1967, that the negotiator received release of the full amount necessary to cover the 1968 program year requirement.

In anticipation of their release, a written notification of availability of funds, addressed to plaintiff's Nutley, New Jersey, office had been prepared for the signature of the contracting officer. Immediately upon receipt of the funds, the notification, which was in the form of an authorization for a teletype message, was signed by the contracting officer. This authorized transmission of the message to plaintiff. Immediately after signing, the contracting officer directed that the message be hand-delivered to the message center of NAVELEX by the contract negotiator. The teletype message notifying plaintiff of the availability of funds for the 1968 buy was delivered from the contracting officer to the message center for transmission at 4:10 p. m. August 15, 1967.

Immediately upon receipt, the message center clerk took action to see that the message was transmitted in due course to plaintiff through the Naval Communications Center in Philadelphia.

Plaintiff maintains, at its offices in Nutley, New Jersey, a teletype machine which operates automatically twenty-four hours a day to receive incoming messages. Due to unaccounted for delays in transmission, the contracting officer's written notification of availability of funds was not received in plaintiff's offices until 6:50 a. m. on August 16, 1967. Since plaintiff's teletype office was unmanned from 5 p. m. on August 15 to 8:15 a. m. on August 16, plaintiff could not have received notice in writing of the contents of any message transmitted during that time. Consequently, it was not until 8:15 a. m. of August 16, 1967, that the supervisor of plaintiff's teletype room in Nutley, New Jersey, examined the roll of messages automatically received overnight and discovered the message in question. As received, the notification of availability of funds stated.

Refer multi-year contract NOBSR 95395 FY 1968 requirement. Item 1 PRC–41 Portable Transmitter Receiver qty 541 ea unit price $2,585.00 Item 2 MK 706/PRC–41 Accessory Kit qty 230 ea unit price $750.00. In accordance with the terms of the contract you are hereby notified that funds in the amount of $1,570,985.00 have been made available for performance of the 1968 program year requirement. Formal modification number 11 citing specific appropriations follows.

There was no difference between the message thus received and that author-

ized for transmission by the contracting officer the day before. While the teletype message as received did not bear the typed signature or title of the contracting officer, it clearly showed that it orig· inated with NAVELEX and that it had gone through the Naval Communications Center in Philadelphia solely as part of the means of transmission. Within minutes after its receipt, the written notification was hand-delivered to plaintiff's contract administrator.

In the meantime, at approximately 4:30 p. m. on August 15, 1967, Mr. Edward P. Stover, a contract negotiator, of the Department of the Navy, made a telephone call to ITT's Washington office. The call was answered by Mr. William D. Chandler who was, at that time, Director of Field Marketing for ITT Gilfillan, a wholly-owned subsidiary company of International Telephone and Telegraph. The ITT representative, Mr. Chandler, testified at the hearing that the contract negotiator told him that the contracting officer wanted the Washington office of ITT to know that the Navy "was executing an option on a contract" for PRC–41 radios. He quickly read the contracting officer's message indicating it was not necessary for the ITT representative to take it down verbatim as the formal notification had been sent by teletype and he was simply calling to communicate "the intent of the Navy to pick up the FY 68 option." The ITT representative said that he understood that the substance of the message was that the Navy was "picking up the FY 68 option for the PRC 41 * * *." He then made written note of the contract number, that the buy being exercised pertained to the PRC–41's, and the amount of the total dollars made available. Mr. Chandler informed Mr. Stover that he was not the representative of ITT Federal Laboratories. Mr. Chandler then relayed the content of Mr. Stover's message to Mr. James L. Singleton, also of the ITT Washington office. Mr. Singleton was at that time, Commercial Field Representative, Space Systems, ITT Defense Communications. At 4:50 p. m.

on August 15, 1967, Mr. Singleton placed a telephone call to Mr. Emory Rose in Nutley, New Jersey. Mr. Rose was, at that time, Vice President for Marketing for ITT Defense Communications Division. Mr. Singleton informed Mr. Rose of the message which Mr. Chandler had received from Mr. Stover.

Although plaintiff's marketing vice president indicated he would inform plaintiff's contract people of the contracting officer's message, and, although the latter were in their offices in Nutley until 6:30 that evening, he did not do so, nor was he called to explain his inaction. Plaintiff's legal and contract representatives first learned that the contracting officer's message had been given plaintiff's marketing vice president on August 15, when they delivered plaintiff's letter of August 17, mentioned below, by hand to the contracting officer on August 18.

By telegram, and by letter, both of which were dated August 17, 1967, plaintiff advised the contracting officer that since defendant had not in a timely manner and in writing exercised its right to use FY 1968 funds for the purchase of additional quantities in accordance with the terms of the "Cancellation of Items" clause, plaintiff was preparing its Cancellation Costs.

On August 22, the contracting officer responded stating that:

* * * By TWX, date and time group 1520107, ITT Federal was notified that funds in the amount of $1,570,-985.00 had been made available for performance of the 1968 program year requirement. In addition, the local office of ITT Federal was advised of the government's intent by a telephone conversation at 4:15 p. m. on 15 August between Mr. E. P. Stover of NAVELEX and Mr. W. Chandler of ITT.

* * * [T]he Government does not consider that cancellation charges are in order in this instance inasmuch as you were advised within the contract time requirements both by telephone and telegraph, in accordance with the appropriate clause of the contract, that

funds were available for the Fiscal Year 1968 quantities.

Following receipt of defendant's letter of August 22, as set forth above, plaintiff's representatives met with the commander of NAVELEX on September 6, 1967. At this meeting, the government representatives strongly reiterated the view that plaintiff had received timely and adequate notice of the exercise of the 1968 buy and was therefore obligated to furnish the items at the original contract price. Plaintiff, on the other hand, steadfastly took the position that it had not received the notification required by the contract in order to place it under obligation to produce follow-on items for Fiscal Year 1968. Recognizing this disagreement, the Navy made clear that it wanted the equipment and the commander of NAVELEX made a point of the fact that there was a disputes clause in the contract which required plaintiff to proceed with performance in accordance with the contracting officer's direction pending resolution of the disagreement.

By letter of September 7, 1967, plaintiff advised that without prejudice to its legal position, it was proceeding to perform in accordance with the contracting officer's direction. It further advised that it considered the government's direction to proceed with the 1968 items to be a constructive change order and that it would in due course present a claim for an equitable adjustment in the contract price. By TWX of September 14, 1967, the contracting officer denied that any direction to proceed other than in accordance with the terms of the contract had been issued. In reply, plaintiff made clear that it was not proceeding as a volunteer but was proceeding in accordance with the "Disputes" and "Changes" clauses of the contract and would continue to do so in the absence of some contrary direction from the government. Such direction was never received. The Board found that in proceeding to fulfill the 1968 program year's requirement, plaintiff did not act as a volunteer.

By letter dated December 15, 1967, signed by Captain C. A. Appleby, U.S.N., and letter dated December 27, 1967, signed by the contracting officer, defendant denied plaintiff's claim for the cost plus an allowance for a reasonable profit thereon incurred by plaintiff in furnishing the Fiscal Year 1968 items as described in the contract here in controversy.

By letter dated January 10, 1968, plaintiff timely appealed from the final decision of Captain Appleby and the contracting officer.

After a hearing, the Armed Services Board of Contract Appeals in Docket No. 12987 denied plaintiff's claim by decision dated August 11, 1969.

We reverse the decision of the Board and hold that the plaintiff is entitled to recover.

■ The question to be decided is the proper interpretation of the contract as to the time and manner of giving notice by the government to the plaintiff in order to require the plaintiff to furnish the equipment for 1968. This is a question of law to be decided by the court. The plaintiff says that the contract provided in plain and unequivocal terms that the notice had to be given on or before August 15, 1967, *in writing,* in order for it to be effective, and, if not so given, the contract terminated. The defendant, on the other hand, argues that notice did not have to be given *in writing* on or before August 15, 1967, but that the oral notice given on August 15, plus the written notice given on August 16, was sufficient to comply with the requirements of the contract. The Board sustained the position of the defendant and held:

\* \* \* [W]e conclude that the notice contemplated by the parties was in fact given and received within the time specified in the contract and that appellant [plaintiff] is not entitled to an adjustment in the contract price for the performance rendered.

The Board relied heavily on the oral notice given on August 15th, and indi-

cated it would have decided the issue in favor of the plaintiff had it not been for the oral notice. In this connection, the Board said:

> Absent anything else, we would be inclined to hold that this notice [written notice] had to be received by appellant [plaintiff] on or before 15 August 1967 in order to impart to it timely knowledge of the availability of funds and the continuance of the contract. Cf., Dynamics Corporation of America v. United States [289 F.2d 424], 182 Ct.Cl. 62 (1968).

In fact, the Board sought to distinguish the *Dynamics* case, where we held the written notice had to be issued by the government and received by the contractor during the contract period to be effective, from the instant case by saying there was no oral notice given in *Dynamics*. We think the Board read too much into the oral notice and erred in making it the dominant and controlling factor in its decision. The parties never contemplated the giving of an oral notice and such a notice is not even mentioned in the contract. The oral notice is actually immaterial in affecting the legal rights of the parties and cannot, either singly or together with the late and untimely written notice, control the decision in this case. As a matter of fact, it was not intended by the defendant that the oral notice when given was the notice required by the contract. This is shown by the Board's finding that when the government's representative phoned the representative of the plaintiff on August 15, he told him he need not take down the message verbatim because "the formal notification had been sent by teletype."

 It is clear that in this case, as well as in all similar cases, we must look to the terms and provisions of the contract in order to properly interpret their meaning. All of the provisions and clauses must be read and construed together and considered as a whole. When this is done, we see that the Limitation of Price and Contractor Obligations clause, Section (b), which is quoted in full, *supra,* provides in pertinent part as to notice as follows:

> * * * Upon availability to the Contracting Officer of additional funds sufficient for performance of the full requirements for the next succeeding Program Year, the Contracting Officer *shall, not later* than the date specified in the Schedule, unless a later date is agreed to by the parties, so *notify* the contractor *in writing* and the amount of funds described in the Schedule as available for contract performance shall be modified accordingly. This procedure shall apply for each successive Program Year. [Emphasis supplied.]

Section (d)' of such clause provides in pertinent part as follows:

> (d) The contractor is not obligated to incur costs for the performance required for any Program Year after the first unless and until he has been notified *in writing* by the Contracting Officer of an increase in availability of funds in accordance with paragraph (b) of this clause * * *. [Emphasis supplied.]

The schedule of dates mentioned in Section (b) above is as follows:

> The clause entitled "Limitation of Price and Contractor Obligations" is modified to specify 15 December 1966 as the date by which the Contracting Officer shall notify the Contractor of the availability of funds for the Fiscal Year 1967 program; 15 August 1967 for the Fiscal Year 1968 program; and 15 August 1968 for the Fiscal Year 1969 program.

The government was given the right to cancel the contract either by an act of commission or of omission as shown in the Cancellation of Items clause, which provides in pertinent part as follows:

> * * * Such cancellation shall occur only if, within the time period specified in the Schedule, or such further time as may be agreed to, the Contracting Officer (i) notifies the contractor that funds will not be available for contract performance for any

subsequent Program Year; or (ii) fails to notify the contractor that funds have been made available for performance of the Program Year requirement for the succeeding Program Year.

It will be seen that Sections (b) and (d) of the Limitation of Price and Contractor Obligations clause provides expressly that the contracting officer *shall, not later than the date specified in the schedule* (August 15, 1967, for the 1968 program) *notify* the contractor *in writing* of the availability of funds for the ensuing year; and that the contractor shall not be obligated to incur costs for any year after the first *unless* and *until* he has been notified *in writing* by the contracting officer of the availability of funds. The plain meaning of these provisions is that the notice must be given in writing on or before the date specified. This was not done in this case.

The defendant argues that the notice did not have to be given in writing because subsection (i) of paragraph (b) of the Cancellation of Items clause does not require a notice of cancellation given by the defendant to be in writing and that this clause prevails over the clauses discussed above which require a written notice. We do not agree. Subsection (i) applies only to an *affirmative* notice of cancellation given by the contracting officer to the contractor. That was not done here. Consequently, Subsection (i) is irrelevant to any issue in the case. Subsection (ii) is relevant because it provides that the contract is cancelled if the contracting officer "fails to notify the contractor that funds have been made available for performance of the Program Year requirement for the succeeding Program Year." How does the contracting officer notify the contractor that such funds are available? We have to look at Section (b) of the Limitation of Price and Contractor Obligations to find the answer. It provides very specifically that the contracting officer will notify the contractor *in writing* that the funds are available. It is clear that instead of supporting the contention of the defendant, the Cancellation of Items clause, when construed with the other provisions of the contract, has the opposite effect.

The conduct of the parties is of great weight in the interpretation of a contract. A.R.F. Products, Inc. v. United States, 388 F.2d 692, 696, 181 Ct.Cl. 1176, 1182–1183 (1967). It will be recalled that in the case before us, the government exercised its right to the performance of the 1967 Program Year requirements by issuing Modification No. 3 to the contract, which was dated December 13, 1966, was signed by contracting officer and notified plaintiff in writing that funds were available for performance of the 1967 Program Year requirements. The last day for the government to notify the plaintiff in writing that funds were available for the 1967 program was December 15, 1966. The fact that the government notified the plaintiff in this regard *in writing* on December 13, 1966, two days before the deadline, plus the further fact that the plaintiff acted on the basis of such notice in fully performing the contract in 1967, indicates that the parties construed and interpreted the contract as requiring such notice *in writing* on or before the specified date. The position of the plaintiff with respect to the notice for the 1968 program is in complete accord with this interpretation of the contract as shown by the conduct of the parties for 1967.

We are also of the opinion that time was of the essence with respect to the giving of the notice. The parties made it so by the wording of the contract. The contract provisions were binding as to the time the notice was required to be given. See 1 Corbin–on Contracts § 35 (1963 Ed.), where it is said:

\* \* \* When he makes the offer he may specify in it the time within which acceptance must occur; if he does so, the power of acceptance is limited accordingly.

The offeror's limitation of the time is not operative if it is not communicated to the offeree so that he knows

or should know of it; but if so communicated it operates with certainty. \* \* \* [Footnotes omitted.] [*Id.* at 142–43.]

Also see 1 A. Corbin—on Contracts § 273 (1963 Ed.), as follows:

> If the time for acceptance of an ordinary offer is expressly limited by the offeror, acceptance must take place within that time or not at all; time is of the essence. The same is true of an offer that has the form of an option contract. [Footnote omitted.] [*Id.* at 588.]

■ It is also our view that the manner of giving the notice (in writing) was made of the essence by the parties in the wording of the contract.

Since the government failed to comply with the provisions of the contract as to the time and manner of giving the required notice, the contract was terminated in accordance with its cancellation clause.

A great deal of time was spent by the parties in their briefs and at oral argument in arguing the question of whether or not the contract involved here was an option contract. The plaintiff contended that it was an option contract and the defendant asserted that it was not an option contract, but was a multi-year procurement contract. The basis for these divergent views bears on the question of whether the notice had to be given by the government to the contractor in the time and manner specified in the contract. The plaintiff says that since the contract was in the nature of an option, the notice was in the nature of an acceptance by the government of plaintiff's outstanding and irrevocable offer and was required to be given at the time and in the manner specified in the contract to be effective. In support of this position, the plaintiff cites 1 A. Corbin—on Contracts § 259 (1963 Ed.), which states:

> \* \* \* The primary element, that differentiates it [an option contract] from all other contracts, is that the option Holder has the legal power to consummate a second contract for the contemplated exchange of equivalents and at the same time the legal privilege of not exercising it. The option given, on the other hand, has the correlative liability to become bound to execute that exchange, and at the same time a disability to avoid it. [Footnote omitted.] [*Id.* at 464.]

Plaintiff also cites 1 Corbin—on Contracts § 43 (1963 Ed.), which provides:

> An offer can be made irrevocable in two ways, and probably only two; these are by contract and by statute. \* \* It is irrevocable only when he has promised not to revoke it, or has promised the offered exchange of performances on condition of acceptance within a period of time, and that promise is binding by reason of a seal, a consideration given in exchange, or subsequent action in reliance upon it. Such a binding promise is itself a contract, as that term is commonly defined. In such cases, also the offeree is said to have a "binding option." [Footnotes omitted.] [*Id.* at 175.]

The defendant says that the agreement is a multi-year procurement contract and not an option contract, and for this reason the notice did not have to be given in writing. It says that all that was required was for the government to make known to the plaintiff within the time stated in the contract that funds were available for the ensuing year and that this can be done orally or in writing or a combination of both. The Board sustained the defendant on this point, citing Lowell O. West Lumber Sales v. United States, 270 F.2d 12 (9th Cir. 1959). We do not think that case is apposite. There the court said it could not be determined from the wording of the contract whether it was a "call" type contract whereby the government could make calls on the contractor for materials if it chose to do so, or a "requirements" contract whereby the government was required to make such calls on the contractor if it made any at all in the western area. There the court said:

> \* \* \* Here the plain fact is that the question of whether the govern-

ment is obligated to place calls with the appellant is simply not covered or dealt with in any way in the contract. * * [*Id.* at 17.]

And again at 17:

* * * Here the government's own contract fails to reveal the intent of the parties as to whether or not the government was obligated to make calls. * * *

That is not the situation in the case before us. Here, the contract specifically required the government to notify the contractor in writing on or before a fixed date.

Both parties cite the definition in ASPR ¶ 1–1502 of an option clause which is as follows:

1–1502 Definition. As used in this Part, an option clause is a provision in a contract under which, for a specified time, the Government may elect to purchase additional quantities of the supplies or services called for by the contract, or may elect to extend the period of performance of the contract.

Both parties contend that this definition of an option clause supports their views on the contract involved here. The defendant also cites various regulations containing various option clauses as examples, saying none of those clauses appear in the instant contract.

On the whole, it appears that the plaintiff has the better of this argument. This is supported by the fact that the government's contract negotiator thought he was exercising an option when he phoned plaintiff's representative on August 15. This is shown by his statements, as found by the Board, that he was calling to communicate "the intent of the Navy to pick up the FY 68 *option*," and that the Navy was "picking up the FY 68 *option* for the PRC–41's" and that the Navy "was executing an *option* on a contract" for PRC–41 radios. (Emphasis supplied.)

Furthermore, the Board indicated the contract had some of the characteristics of an option contract when it said:

In its details the contract in some respect is not unlike an indefinite or optional quantities requirements contract.

The Board went on to say:

* * * Here, however, the additional quantities were not indefinite or optional but fixed amounts which the Government was obligated to buy in full each year unless it cancelled the contract in its entirety. * * *

On this basis, the Board held that the agreement was not an option contract. The trouble with this reasoning is that the government did in fact cancel the contract by failing to give the notice that was required to keep it in force.

Plaintiff's contention that this is an option contract is supported by our decision in Dynamics Corp. of America v. United States, 389 F.2d 424, 182 Ct.Cl. 62 (1968), although the facts in that case are different in some respects to those in the instant case. There the government was given the right to "issue calls" upon the contractor for generator sets within a period of 18 months. The price was fixed, but the quantities were indefinite, except maximum quantities were specified. The government issued calls from time to time. The last three calls were issued during the period of the contract but were received by the contractor *after* the end of the contract. The question was whether or not these three calls were valid. The majority of the court held they were invalid because the agreement was an option contract and the calls had to be issued and *received* during the period of the contract.[1]

With respect to the option feature of the contract in that case, the court said:

In analyzing this contract, it cannot be seriously disputed that the portion in question is most accurately characterized as an option contract.

1. The writer dissented in that case on the ground that the contract only required that the calls be "issued" during the period of the contract without any requirement that they must also be received by the contractor during that period.

As related above, Part VIII ("Orders") of the Special Provisions provides:

> * * * The Contractor agrees to furnish to the Government, when ordered, the supplies or services set forth in the Schedule up to and including the quantity designated in the Schedule as the "maximum quantity". * * *

[389 F.2d at 430–431, 182 Ct.Cl. at 74.]

The court cited ASPR 1–1502, 32 C.F.R. § 1.1502 (1967) which defines an option clause, and which is quoted above. Also, the court cited ASPR 1–1505, 32 C.F.R. § 1.1505 (1967), which provides how options may be exercised as follows:

> 1.1505 Exercise of options.
>
> (a) The exercise of an option by the Government requires the contracting officer's written notification to the contractor within the time period specified in the contract.

The instant case is similar in many respects to the *Dynamics* case. The facts in our case are more favorable to the contractor than they were in *Dynamics*. Here the contract required the government to notify the contractor in writing on or before a fixed date, which contemplated not only the issuance of the notice by the government, but also its receipt by the contractor on or before that date. In *Dynamics*, all that the contract specified was that the calls had to be "issued" by the government during the contract period. Yet the court held that the calls had to also be received by the contractor during the period of the contract in order to be valid.

Actually, the argument as to whether or not the agreement here is an option contract is largely a matter of semantics. We do not feel that it is necessary to decide that question one way or the other, as it is not necessary to a disposition of the case. Whether the agreement is classified as an option contract or placed in a different category is not dispositive of the case. We are required to interpret the language of the contract and from such interpretation determine the rights of the parties, regardless of how the contract might be classified.

■ We hold that by the plain terms of the contract, the contracting officer was required to give notice on or before August 15, 1967, to the contractor in writing that funds were available for 1968 in order for the contract to remain in force in 1968, and when he failed to give such notice, the contract was cancelled. Thereafter, when the contracting officer required plaintiff to furnish the equipment in 1968 at contract prices, it amounted to a constructive change for which plaintiff is entitled to an equitable adjustment.

The motion for summary judgment of plaintiff is granted and that of the defendant is denied. The decision of the Board on the issue of liability is reversed, and the case is remanded to the Board for the purpose of determining the amount due plaintiff as an equitable adjustment to the contract price. Proceedings in the case are hereby suspended in this court for a period of 120 days from this date for such Board determination. The plaintiff will comply with Rule 167 and the appropriate provisions of the General Order of the court implementing it. Upon the conclusion of the proceedings of the Board, the plaintiff will report the result to the court and the parties will take further action for the final disposition of the case in this court.

DAVIS, Judge (dissenting):

Judge Nichols' general understanding of the arrangement between plaintiff and the Government makes much sense and may very well be correct, but I find it unnecessary to grasp that broad a disposition. For me, the significant element is that, no matter how one characterizes the contract, timely *written* notification was not of the essence although *timely* notification was—adequate and timely oral notice followed shortly by a writing would be sufficient compliance. Unlike Dynamics Corp. of America v. United States, 389 F.2d 424, 182 Ct.Cl. 62 (1968), there was here timely oral notification; only the written paper was

late.[1] Putting controlling emphasis on the timeliness of the notice—rather than on the timeliness of the written follow-up, once notice is given—seems to me called for by a reading of the "Cancellation of Items" clause together with the "Limitation of Price and Contractor Obligations" article. Though the latter, in describing the mechanics of the notice, refers to "writing", the former simply points to notification, without specifying that it must be written. This suggests to me that it was the notice which was "of the essence", not the means by which it was transmitted, and I am confirmed in this interpretation by my inability to think of any good reason why a timely written notice would or should be considered essential if adequate oral notice had been given on time. It could, of course, be important for the contractor to know by August 15th whether or not the contract was to be continued, but I fail to see why, if it had in fact been so informed by that date, a failure to give it the written notice at the same time would or could harm it in the slightest. I agree with the Board of Contract Appeals that "to attribute to the contract [that] meaning would produce * * * an unjust and unnecessary result." If the shoe had been on the other foot and the contractor had wanted a continuation of the contract but had received only oral notice by the due date, I am sure that it would be both unjust and unnecessary to hold that the Government could back out of its commitment because the written component of the notification did not reach the contractor until a few hours after the deadline. Taken as a whole, this contract does not seem to me to require that reading.

NICHOLS, Judge (dissenting):

This case presents a difficult problem of contract interpretation. The solution proposed in the majority opinion will appear correct to some lawyers and may have beneficial results in persuading the procurement authorities to state their intentions more clearly in future contracts. Nevertheless, with all respect, I think it is wrong. Consideration must be given and has not been, to the circumstances under which the contract was awarded, and the intentions of the parties, as they can be deduced from the contract language and the ASPR Regulations which are part of the contract.

The multi-year type contract used here is to be made use of, according to ASPR 1–322, when military requirements for an item are known and will be stable for a planned period, of up to five (5) years, and economy can be achieved by contracting for the entire requirements, but the total funds to be obligated by the contract are not available. This condition doubtless has existed from time to time since the days of Alexander Hamilton and results from statutes, 41 U.S.C. § 11, and 31 U.S.C. § 665, which make it a criminal offense for an officer or employee to obligate the United States to pay money in advance of a Congressional appropriation therefor. A willful violation is punishable by a fine of not more than $5,000, or imprisonment for not over 2 years, or both. This means, that absent such a device as is made use of here, appropriated funds often must be obligated years in advance of the time when they are actually spent. Congress may have to be asked to appropriate for fiscal 1965 money that is not to be spent until fiscal 1970. This compels the procurement authorities to request appropriations in excess of what they are going to spend in the immediate future, and from the point of view of Congress, lessens its financial control by the vast sums of money obligated and in the pipeline, but not spent.

The scheme set up in the above cited ASPR for multi-year procurement, is one of those that have been devised to get around this problem. Essentially, obligations for years after the first come into being only when the money is appropriated and funds are available for obligation. It seems to me that the plaintiff and the majority opinion herein treat

---

1. In my view, the TWX was sufficient in form. If it had been received the day before, there would be no doubt that timely written notification had been made.

the notice that funds are or are not available simply as a euphonious way of saying that the Government does or does not choose to continue procurement. This is not so at all. If, for example, the contracting officer learns that the Government requirements are diminishing and wishes to cancel for that reason, but funds are available, he would be violating the contractor's legal rights in a most serious way if he attempted to make use of the cancellation clauses herein. The contract says if funds are available he "*shall * * * so notify the contractor.*" (Emphasis supplied.) Under those circumstances, as the Regulation says, the contractor would be entitled to a settlement in accordance with the "Termination for Convenience" clause and could obtain a termination settlement on terms much more favorable to him than the "cancellation charge" he can recover in case of unavailability of funds. Despite the contract clauses *cited by* Judge Skelton, I have no doubt that a contracting officer who had learned that funds were available for a subsequent year, but failed to advise the contractor of the fact within the prescribed period, hoping to effectuate a cancellation, would be brought up very short indeed by the contractor if the contract was valuable to him. Yet, I read *Judge* Skelton's opinion as holding that in such a case the mere failure to give notice would remit the contractor to the unremunerative cancellation charge, and this I deem to be in conflict with the entire scheme.

I think it is unfortunate that the parties failed to inform the court as to the methods by which funds are made available, thus allowing the impression to prevail that saying funds are unavailable is the same as saying the Government exercises an option to withdraw from the contract, or that the difference is, as Judge Skelton calls it, "a matter of semantics." As a matter of judicial notice, I know that in order to be available, appropriations have to be requested by the President and appropriated by Congress. Congress exercises, at times, its prerogative of refusing to appropri-

ate. Even after the President has signed the appropriation bill he can exercise his prerogative of impounding the funds so that the Secretary of Defense cannot obligate them. Once funds are available to his Department, however, the Secretary can determine and direct their destination except insofar as they are "line items" appropriated for only a single purpose. Finally, a procurement activity learns that an allotment has been made to it and funds are available to effectuate its program. Of course, the procurement activity could then make the funds unavailable by spending them for something other than to service its outstanding multi-year contracts.

I think, however, that the framers of the language and contract clauses involved had most clearly in mind that funds would be unavailable because of a stoppage somewhere prior to their reaching the procurement activity and therefore not within its control. If the latter itself made the funds unavailable, I have considerable doubt what the rights of the contractor would be and it would produce a most interesting question. However, funds were available here and that problem does not arise. The question here is, as I see it, whether a contracting officer can cut off and destroy what I see as valuable contract rights, simply by not performing the ministerial act of notifying the contractor that funds are available, when they are available in fact.

The contract language difficulty arises out of the "Cancellation of Items" clause, paragraph (b), including the following, which is included for clarity:

* * * Such cancellation shall occur only if, within the time period specified in the Schedule, or such further time as may be agreed to, the Contracting Officer (i) notifies the contractor that funds will not be available for contract performance for any subsequent Program Year; or (ii) fails to notify the contractor that funds have been made available for performance of the Program Year requirement for the succeeding Program Year.

I believe the Government officials who drafted the language used the words "only if" in the loose way that people sometimes do these days and that they really meant to say "Such cancellation shall occur, if at all, only when * *." The idea that the contracting official by his mere whim or inadvertence can fail to give notice and thus destroy what would normally be a valuable contract right—to whichever side valuable—is contrary to the whole scheme set out in the ASPR Regulation.

Contractors are to be induced to bid, the Regulation tells us, in the expectation that they will have a large multiple year contract to perform in convenient annual installments, lowering their costs, enhancing standardization, reducing administrative burden, obtaining production continuity and stabilizing the work force. Persons it is hoped will bid for multiple years who would not bid for a single year, thus broadening competition. These hopes are defeasible only in the relatively unlikely contingency of funds not being available. When contractors learn from Judge Skelton's opinion, that their rights are so easily destroyed, for other reasons, they will not offer the low prices they would for a firm multi-year procurement but only a higher price for a single year, or not bid at all. Thus, in helping ITT, which probably does not need our help, to escape from what it came to regard as a bad bargain, the court frustrates the ASPR Regulation, and makes it useless for its intended purpose.

It might be urged, I suppose, though Judge Skelton does not, that the written notice provision is for the protection of the contractor and could be waived by it. In my view, however, its primary purpose is to protect the officials concerned with awarding and administering the contract. It makes sure they will not by inadvertence or clerical errors obligate unappropriated funds and thus be exposed to fine or imprisonment or both, under 31 U.S.C. § 665. Plaintiff's use of it is as unintended as it is unwelcome to defendant.

I would add that the people of the United States also had valuable rights, in this contract, which did not belong to defendant's procurement officers for them to preserve or destroy as their whim might dictate. I am sure this was the intention. If the contract says otherwise, which I deny, I would reform it to state the true intent of the parties.

Therefore, I would award plaintiff not the cost of performing, plus profit, but only the actual injury to it, if any, resulting from a single day's delay in giving it its legal notice that funds were available. On the theory which actually animates plaintiff's petition, the proper disposition of the case can only be to allow defendant's motion for summary judgment, and this I would do.