**NORWOOD MANUFACTURING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 571–88 C.**

United States Claims Court.

Aug. 10, 1990.

---

A. Patrick Leighton, St. Paul, Minn., for plaintiff.

Scott Ray, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

In 1987, the United States Postal Service (USPS) awarded Norwood Manufacturing, Inc. (plaintiff or Norwood) a contract to

produce lightweight nestable pallets. USPS uses pallets to transport bulk mailings. Nestable pallets stack easily one on top of another. Norwood produced waferboard pallets with plastic legs.

On February 9, 1988, USPS terminated the contract for default. USPS defaulted plaintiff for late deliveries and a breach of warranties. Plaintiff now seeks to convert the termination for default into a termination for convenience of the Government. Plaintiff also claims anticipatory profits for USPS bad faith.

On January 30, 1990, defendant moved for summary judgment. Plaintiff cross-moved for summary judgment. Following oral argument, this court grants defendant's motion for summary judgment and denies plaintiff's cross-motion.

### FACTS

In August 1986, USPS issued a solicitation for 657,000 lightweight nestable pallets. USPS wanted these pallets to carry bulk mail. The solicitation required the pallets to be 40 × 80 inches, nestable, strappable to each other, and capable of carrying 2,500 pounds of bulk mail. Generally, however, the specifications set forth few minimum requirements and accorded the successful bidder wide discretion in choosing materials and the method of production.

The solicitation also contained an intended use clause:

> *Intended Use*—Pallets covered by this specification are intended for use with forklift and handlift trucks for general materials handling operations in storage and distribution systems.

Contract No. USPS–P–1017C (ESC) (Contract), at § 6.1 *reprinted in* Defendant's Appendix, No. 571–88 C, filed Jan. 30, 1990 (Def.App.), at 598. To ensure production consistent with this intended use, USPS required first article testing. Accordingly, USPS approval of sample pallets set production in motion.

Prior to bidding, plaintiff requested that USPS change the required pallet height of 5½ inches to a maximum height. USPS granted this modification. Plaintiff therefore submitted a bid for pallets with a deck thickness of less than 1⅝ inches.

After considering both unit costs and freight costs, USPS designated Litco International Inc. (Litco) as the low bidder. Plaintiff requested a re-evaluation of its proposed transportation costs. Accordingly, USPS conducted an informal technical evaluation of plaintiff's facility. The evaluation report recommended against awarding the contract to plaintiff. Thus, in November 1986, USPS awarded the contract to Litco and rejected plaintiff's bid.

The Contracting Officer (CO) denied plaintiff's timely protest. Plaintiff renewed its protest to the Associate General Counsel for the Office of Contracts and Property Law. The Defense Contract Administration Service Management Area (DCASMA) conducted a pre-award survey. After plaintiff furnished an inspection system conforming to specification MIL–I–45208, DCASMA recommended award to plaintiff.

On May 26, 1987, USPS awarded plaintiff an f.o.b. origin contract for 657,000 pallets.[1] Norwood's contract (No. 104230–87–V–H–321) was virtually identical to Litco's contract (No. 104230–87–V–H–314). Plaintiff's contract contained two options, each for an additional 750,000 pallets. USPS exercised both options on July 27, 1987, thereby increasing to 2,157,000 the number of pallets on order from plaintiff.

Plaintiff participated in first article testing on August 20, 1987. The specified tests included: nesting, capacity, flexural strength, strapability, and mechanical handling. The specification required testing with uniformly distributed loads. Plaintiff chose to use stacks of waferboard, of the same dimensions as the pallet, as its test load. This test satisfied the specification, but did not approximate actual use conditions. Bulk mail would rarely, if ever, rest

---

**1.** F.o.b. origin contracts obligate the bidder to "deliver shipments in good order and condition to the carrier, and load ... shipments on or in carrier's conveyance...." Defendant's Appendix, No. 571–88 C, filed Jan. 30, 1990 (Def.App.), at 493.

uniformly across the entire surface of the pallet. Rather, loading and movement of the mail would shift the burden from one place to another across the pallet surface. The waferboard stacks, on the other hand, tended to reinforce rather than strain the thickness and stiffness of the pallet deck.

Plaintiff's pallets passed these first article tests. Plaintiff thereafter sent the test report to the CO for first article approval. Further, the contract instructed:

> The Contracting Officer shall, by written notice to the Contractor within fifteen (15) calendar days after receipt of such test report by the Postal Service, approve, conditionally approve, or disapprove such first article.

Contract, at § H.1, *reprinted in* Def.App., at 549.

USPS notified Norwood of first article approval by telephone on September 21, 1987. On that same date, USPS issued Modification 03 authorizing Norwood to begin production. Plaintiff signed the modification three days later and returned it to USPS. On October 2, the CO signed Modification 03.

The contract required plaintiff to begin delivering pallets no later than sixty days following first article approval. The contract required plaintiff to complete delivery of the entire first installment of 30,800 pallets within ninety days of first article approval. In correspondence, plaintiff told USPS of possible delays. Def.App., at 102, 106. By December 21, 1987, plaintiff delivered 24,200 pallets. Plaintiff delivered 30,800 pallets by the end of the year. By February 2, 1988, plaintiff had delivered 48,400 pallets.

Plaintiff sent a sample lot of ten pallets to a USPS facility in Corinth, Mississippi prior to the scheduled delivery date. According to an October 30 USPS report, these sample pallets failed in use. Subsequently, users of the pallets delivered in December complained that the pallets did not perform properly. Specifically, plaintiff's pallets would not work on assembly lines and would snap or break when carrying loads in excess of 1000 pounds.[2] Often, the plastic pallet legs broke when hit by a forklift or if strained by uneven loads.

On January 15, 1988, the CO issued a "stop work" order. Four days later, the CO withdrew the "stop work" notice and substituted a cure notice. The cure notice complained of late deliveries and breach of the warranty of supplies. Plaintiff proposed five possible solutions.[3] After evaluation, USPS rejected these proposals.

USPS terminated plaintiff's contract for default on February 9, 1988. Plaintiff thereafter filed a claim with the Office of Contracts. After denial, plaintiff filed suit in the United States Claims Court.

Plaintiff alleges that USPS improperly terminated its contract for default. In response to the CO's delivery delay grounds for default termination, plaintiff asserts that the date of first article approval was October 2, 1987. Accordingly, plaintiff contends that its deliveries were on time. USPS argues, however, that first article approval occurred on September 21, 1987. Measuring delivery deadlines from this earlier date, defendant contends that plaintiff's deliveries were late.

In response to the CO's second grounds for default termination, plaintiff argues that it did not breach any warranties. Plaintiff maintains that USPS specified the design of the pallets. Therefore, plaintiff claims that USPS assumed the risk of product failures. USPS asserts, however, that it provided only performance specifications. USPS argues, therefore, that plaintiff

---

**2.** The contract required testing with loads up to 2,500 pounds. *See* specification USPS–P–1017C (ESC), at § 4.6.2.2, *reprinted in* Def.App., at 597.

**3.** Norwood's proposed solutions were:
   1. A ¼″ waferboard or plywood interference between deck and load to assist in transferring vertical load to top support load bearing perimeter.

2. Corrugated interface between deck and load.
   3. Increase deck thickness to $^{13}/_{32}$″ or ½″.
   4. Increase deck thickness to ⅝″ (major retooling).
   5. Restrict sidewall movement of center support by stapling lower ledge to waferboard. Def.App., at 144.

breached the contract's intended use clause.

This court first must decide whether plaintiff made late deliveries. Next, this court must determine whether plaintiff breached the warranty of supplies. Finally, this court must weigh plaintiff's bad faith argument.

### Discussion

In the case at hand, defendant has moved for summary judgment and plaintiff has cross-moved for summary judgment. Under RUSCC 56(c), this court may grant summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The movant has the burden of proving the absence of factual issues. *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146 (Fed.Cir.1983). The movant may meet this burden by establishing that the nonmoving party has not proved an element of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmovant cannot escape summary judgment through mere denials, speculation, or bald assertions. *Barmag Barmer Maschinenfabrik A.G. v. Murata Machine, Ltd.,* 731 F.2d 831, 836 (Fed.Cir. 1984).

When evaluating the merits of a summary judgment motion, this court must resolve reasonable factual disputes in favor of the nonmovant. *Auld,* 714 F.2d at 1146. When both parties move for summary judgment, this court must evaluate each party's motion on its own merits. Thus, this court must draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

### Default Termination

Plaintiff's contract contained a default termination clause:

(a) The Postal Service may, subject to the provisions of paragraph (c) of this clause, by written notice of Default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:
(i) If the Contractor fails to perform the work called for by this contract within the time(s) specified herein or any extension thereof; or ·
(ii) If the Contractor fails to perform any of the other provisions of this contract ... and ... does not cure such failure within a period of 10 days ... after receipt of notice from the Contracting Officer specifying such failure.

Contract, General Provisions for Fixed Price Contracts, at Clause 24, *reprinted in* Def.App., at 490–91.

· USPS contends that it properly terminated plaintiff's contract under the default clause because deliveries were late and plaintiff breached its warranty of supplies. USPS must justify its default termination:

[T]he government should bear the burden of proof with respect to the issue of whether termination for default was justified, regardless of the forum and regardless of whose "claim" is being asserted.

*Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed.Cir.1987).

### Late Deliveries

■ The contract required plaintiff to begin deliveries within sixty days of first article approval. The contract's delivery schedule also set forth a delivery quota for each subsequent thirty-day period. The terms of the contract required f.o.b. origin deliveries.

Plaintiff conducted tests on August 20, 1987. On September 21, 1987, the CO issued written approval.[4] USPS notified plaintiff by telephone that the tests were successful on that same day. USPS also mailed a written notification of approval. The approval notification authorized the contractor "to proceed with the production

---

**4.** The contract required written notice to the contractor within fifteen days of receipt of the first article test report. Accordingly, first article approval should have been issued by September 14.

of the remaining units." Def.App., at 525. The CO did not sign this authorization. Nonetheless, Norwood's president signed and returned the authorization in accordance with standard procurement procedures. The CO finally signed the authorization disclosing first article approval in October 1987.

Defendant now asserts that the initial delivery period began on September 21, 1987—sixty days after USPS orally notified plaintiff of first article approval. Under defendant's theory, the first delivery period ended December 20, 1987. Plaintiff argues, however, that the delivery period began on October 2, 1987—when the CO signed the authorization. Under this approach, plaintiff had from December 1, 1987 until December 31, 1987 to deliver the first 30,800 pallets. To resolve this dispute, the court must determine whether oral authorization started the sixty-day period.

Whether the contract permitted oral authorization is a matter of legal interpretation within the purview of this court. *See P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913 (Fed.Cir.1984). Contract interpretation ordinarily begins with "the plain meaning of the provision in question." *S.W. Aircraft Inc. & Western Helicopter Servs. v. United States,* 213 Ct.Cl. 206, 212, 551 F.2d 1208, 1212 (1977). When interpretation questions arise, the court reads the contract from the perspective "of a reasonable and prudent contractor." *Maffei,* 732 F.2d at 917. In the event it finds more than one reasonable interpretation, the court construes the ambiguity "against the drafter, the Government." *S.W. Aircraft,* 551 F.2d at 1212.

Plaintiff's contract requires the CO to issue in writing and sign both first article approval and all modifications:

> The Contracting Officer shall, by written notice to the Contractor within fifteen (15) calendar days after receipt of such test report by the Postal Service, approve, conditionally approve, or disapprove such first article.... [N]o contract modification will be recognized un-

less in writing and signed by the Contracting Officer.

Contract, at § H.1, *reprinted in* Def.App., at 549, 568. Thus, the contract does not acknowledge unwritten or unendorsed authorizations. The oral notification did not authorize plaintiff to begin deliveries.

To sidestep the clear language of the contract, defendant invokes *Penn–Ohio Steel Corp. v. United States,* 173 Ct.Cl. 1064, 354 F.2d 254 (1965). In *Penn–Ohio,* the Navy and contractor consummated an agreement "subject only to [the Navy's] later *pro forma* approval." *Penn–Ohio,* 354 F.2d at 267. This situation, however, is inapposite to the case at bar. Here, the parties specifically agreed to require written authorization. Moreover, defendant has not shown that the September 21 telephone conversation constituted an agreement to forego written approval and to initiate the delivery schedule. The September 21 conversation simply notified plaintiff that authorization would be forthcoming.

In sum, according to the contract, this court must calculate the initial delivery period from the date of written approval. The initial delivery period began on December 1, 1987—sixty days after the CO endorsed in writing the first article test approval. Accordingly, plaintiff must have delivered the first 30,800 pallets by December 31.

This court must next determine whether plaintiff delivered 30,800 pallets by December 31. Under an f.o.b. origin contract, delivery occurs "as soon as the goods are delivered to the carrier." *United States v. Balanovski,* 236 F.2d 298, 305 (2d Cir. 1956). Additionally, the contract required plaintiff to load shipments onto the carrier's conveyance. Def.App., at 573. Plaintiff argues that it satisfied the contract by December 18, 1987. On that date, plaintiff had the final shipment for the first delivery period on its loading dock ready for shipping. Plaintiff, however, did not deliver the pallets at the moment it stacked them on the loading dock. Delivery occurred when the shipments were loaded. The carrier arrived to pick up the shipment on December 29, 1987. Thus, while plaintiff

may not have delivered on December 16, it did in fact deliver the December shipments by December 31—before expiration of the first delivery period.

On January 19, 1988, USPS issued a ten-day cure notice charging plaintiff with late deliveries. However, plaintiff was not delinquent in pallet deliveries on January 19 or on January 29—the end of the ten-day cure period. The contract only required delivery of the next 50,600 pallets by January 30, 1988. Plaintiff had fulfilled previous deliveries and had no new outstanding obligations. Thus, defendant cannot justify USPS's default termination with late delivery charges.[5]

### Warranty of Supplies

The second deficiency noted in USPS's termination notice is a breach of the warranty of supplies. In pertinent part, the contract provides:

(a) Notwithstanding inspection and acceptance by the Postal Service of supplies furnished under the contract or any provision of this contract concerning the conclusiveness thereof, the contractor warrants that for one year after delivery:

(i) All supplies furnished under this contract will be free from defects in material or workmanship and will conform with the specifications and all other requirements of the contract; and

(ii) The preservation, packaging, packing and making, and preparation for, and method of shipment and supplies will conform with the requirements of this contract.

Contract, at § H.3, *reprinted in* Def.App., at 550.

Defendant claims that plaintiff's pallets did not perform properly when used by USPS mailers. To establish a breach of warranty of supplies, defendant must show that the pallets did not comply with contract requirements. Defendant also must show that the failure fell within the contractor's area of responsibility.

### Compliance with Contract Requirements

Plaintiff contends that it has not breached the warranty of supplies. Specifically, plaintiff believes that USPS has not established any defects in material or workmanship. USPS argues, however, that the warranty of supplies incorporates by reference the contract's intended use clause, which the pallets allegedly have not satisfied.[6]

■ A court must construe together and read as a whole all provisions of a contract. *International Tel. v. United States*, 197 Ct.Cl. 11, 21, 453 F.2d 1283, 1289 (1972). This court must read the intended use clause in conjunction with the warranty of supplies clause, which mandates that the pallets "conform with the specification and all other requirements of the contract." The intended use clause is among these "other requirements of the contract." Thus, the contract's warranty of supplies requires plaintiff to manufacture a pallet suitable for use in mail transportation.

■ USPS has supplied ample evidence that plaintiff's pallets were not functional for the intended use under the contract. In a letter to USPS headquarters, for example, the USPS Transportation Management Service Center remarked:

It was noted that the pallet consists of a piece of flimsy plywood with holes punched to accommodate nine oval shaped plastic cones. The plywood buckled under a load of only 1,600 pounds and the plastic cones began to distort. When picked up by the Fork Lift the pallet contorts outward and the load begins to fall off. A gap between the roller tables

---

5. Defendant further contends that plaintiff failed to deliver the pallets because such goods did not substantially comply with specifications. The contract envisions, however, that the court would address this issue in the context of breach warranty rather than untimely delivery. The contract contains an express defects provision. Further, the contract's default provision delineates issues involving timeliness of delivery *vis-a-vis* compliance with substantive condi-

tions. Thus, this court discusses compliance with specifications under the rubric of breach of warranty rather than late delivery.

6. The intended use clause obligates plaintiff to produce pallets that are operable for the transportation and distribution of mail. *See* Contract, at § 6.1, *reprinted in* Def.App., at 598.

of the shrink wrap machine caused the loaded pallet to contort and the leg dropped down into the gap, spilling the mail, splitting the pallet and popping out the plastic legs on that side of the pallet. It is our opinion that without a radical structural redesign this pallet will not be acceptable for shipping our product.

Def.App., at 96. Donnelley Printing Company, another user of the pallets, similarly stated:

In summary, the East Plant of Donnelley feels that these pallets are not usable in our plant due to pallet performance characteristics and employee safety concerns. We have stopped using the pallet and are requesting that the balance of approximately 1000 pallets be picked up and taken out of our plant. Another load of pallets should be supplied to make up for the returned pallets.

Def.App., at 108. USPS has supplied correspondence from several other users expressing the same concerns and problems. Def.App., at 108–14, 116–17, 135–42. It is not surprising that the pallet defects engendered such dissatisfaction and frustration among users. Pallets are very simple devices that require limited technical expertise to design and construct. The tenor of complaints strongly suggests that users could not have imagined such a simple product having such grave problems.

Pallets delivered to users suffered from an array of defects. Pallets buckled and cracked under 1,500–1,800 pounds, even though the pallets were supposed to withstand 2,500 pounds. Def.App., at 96, 107. Pallets with full loads "juggled like jello," making transport difficult. Def.App., at 107. The pallets failed to work on assembly lines because of the slipperiness of the plastic legs. Def.App., at 1432. The legs also creased and buckled. These failures prevented forklift operators from moving the collapsed pallets. Def.App., at 128. The breakage of pallets damaged bulk mail. *U.S. News & World Report* complained, for example, that the broken pallets caused a loss of at least forty-two bundles of newsstand delivery. Def.App., at 110. In sum, then, the pallets under-mined the efficiency and safety of automatic packaging systems.

Plaintiff asserts, however, that its pallets met the contractual requirements. Specifically, plaintiff contends its pallet passed specified production tests. Yet, the warranty applies "[n]otwithstanding inspection and acceptance...." Contract, at § H.3, *reprinted in* Def.App., 350. Thus, the contract itself notifies plaintiff that passage of the first article test did not excuse plaintiff from compliance with the warranties clause. A single instance of compliance with contract specifications does not guarantee that plaintiff will not be held accountable for all future product failures. The warranty clause, by its terms, applied to product failures after the first article tests.

Further, plaintiff had adequate information to conclude that under normal conditions, where mail would shift around, the pallet would fail. Def.App., at 1416–18. Plaintiff similarly knew that the pallet could fail when used with a forklift. Def. App., at 1437. Thus, in light of the express language of the warranty clause, this court rejects plaintiff's suggestion that USPS could not terminate for default where plaintiff built a pallet which is unsuitable for handling mail.

*Assumption of Risk by Contractor*

Plaintiff contends, however, that USPS assumed the risk of poor performance in the field by issuing design specifications. USPS argues that it issued performance specifications which place the risk of failure on the manufacturer.

In the normal buyer-seller relationship, the manufacturer assumes the responsibility of warranting a product. However, the responsibility shifts to the specification drafter when the specifications significantly diminish the manufacturer's role in designing the product. *See Bethlehem Corp. v. United States*, 199 Ct.Cl. 247, 462 F.2d 1400 (1972); *Hol–Gar Mfg. Corp. v. United States*, 175 Ct.Cl. 518, 360 F.2d 634 (1966); *Austin Co. v. United States*, 161 Ct.Cl. 76, 314 F.2d 518 (1963). Therefore, responsibility for failure of plaintiff's pallets depends on this court's interpretation of the nature of the contract specifications.

The Court of Claims, in *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360 (1969), set forth the distinction between design and performance specifications:

> [I]n these [design] specifications, the defendant set forth in precise detail the materials to be employed and the manner in which the work was to be performed, and plaintiff was not privileged to deviate therefrom, but was required to follow them as one would a road map. In contrast typical 'performance' type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.

*Simmons*, 412 F.2d at 1362.

■ When the Government issues design specifications, it impliedly warrants that a product will be adequate if the contractor conforms to the specifications. *United States v. Spearin*, 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). This warranty, however, does not apply to performance specifications. *See Penguin Indus., Inc. v. United States*, 209 Ct.Cl. 121, 530 F.2d 934 (1976).

■ A specification can have both design and performance characteristics. *See Haehn Management Co. v. United States*, 15 Cl.Ct. 50 (1988). In *Haehn*, a specification for liquid sealant was "dominantly of the design type." *Haehn*, 15 Cl.Ct. at 56. The court explained that the specifications:

> tightly circumscribe any latitude of the contractor in choosing a product that can achieve the standards of performance.... [E]laborate instructions as how to perform the contract, are of a design nature, in contrast to operational characteristics and specifications that

leave the details of how to comply with the contract to the contractor.

*Id.* at 56–57 (citations omitted).

USPS's specification for nestable pallets does not fall entirely into either specification category. The specification had some characteristics of design plans. Specifically, the configuration control drawing delineated the required dimensions of the pallet. The specification further defined the weight, minimum capacity, and other physical characteristics. Specification USPS–P–1017C (ESC), *reprinted in* Def.App., at 594.

USPS's specification, however, was dominantly of the performance type. The specification was not a "road map." *J.L. Simmons*, 412 F.2d at 1362. USPS specified several performance criteria for the pallets. The specification permitted plaintiff to use "[a]ny normal fabricating method...." *See* Def.App., at 595. Plaintiff had the option of using either "a suitable grade of engineering plastic or a combination of wood, fiber, and synthetic resins." Contract, at § 3.2, *reprinted in* Def.App., at 595. Plaintiff chose to construct its pallets using waferboard material with plastic support legs. The initial bid documents indicated a height requirement of 5½ inches. At plaintiff's request, this requirement changed to a maximum dimension. Thereafter, plaintiff used ½ inch thick waferboard for the pallet deck in lieu of the originally specified 1⅝ inch decking. Plaintiff also made the decision to attach the legs to the waferboard by mechanical means.[7]

In these areas where it controlled the product's design, plaintiff retained the obligation to comply with contractual warranties. Thus, plaintiff predominantly worked under a performance specification which gave it substantial latitude in shaping the character and quality of the pallet. Consequently, plaintiff assumed the risk that its plans under the discretionary portions of

---

**7.** Plaintiff was not experienced in making choices about how to manufacture pallets. Paul Bjorgen, President of Norwood, stated in an affidavit: "Other than the contract at issue here,

Norwood had never manufactured lightweight, nestable pallets." Plaintiff's Appendix, No. 571–88 C, filed Mar. 23, 1190, Vol. II.

the specification might not comply fully with intended use requirements.

In the few areas where the specification set forth design requirements, plaintiff did not show that the pallets failed due to faulty specifications. Plaintiff identifies no specification defects. Rather, plaintiff complains that the tests did not simulate use conditions. Defendant, on the other hand, has shown that other manufacturers—using the same specification, but employing different manufacturing methods and materials—produced functional pallets. Def.App., at 65–67. Thus, the pallet failures were within plaintiff's scope of responsibility, not a result of instructions imposed on plaintiff by USPS.

### Abuse of Discretion

■ Plaintiff also asserts that the CO acted arbitrarily and abused his discretion by terminating the contract. The CO, however, had the power and authority to terminate this contract. *Schlesinger v. United States*, 182 Ct.Cl. 571, 581, 390 F.2d 702, 707 (1968). Plaintiff must satisfy a significant burden of proof to show abuse of discretion. Quoting the trial judge, the Court of Claims explained:

> Where, as here, defendant is entitled to exercise its discretion, "plaintiff has an unusually heavy burden of proof in showing the determination made ... was arbitrary and capricious."

*United States Fidelity & Guaranty Co. v. United States*, 230 Ct.Cl. 355, 365, 676 F.2d 622, 630 (1982), quoting *Continental Business Enterprises Inc. v. United States*, 196 Ct.Cl. 627, 637, 452 F.2d 1016, 1021 (1971).

The Court of Claims identified four factors to evaluate when deciding whether a Government official acted arbitrarily:

1. Is there evidence indicating the official's subjective bad faith?

2. Was there any reasonable basis for the decision to terminate?

3. What amount of discretion was granted to the government's agent?

4. Was there a "proven violation of an applicable statute or regulation?"

*Fidelity & Guaranty*, 676 F.2d at 631. In light of these factors, plaintiff has not met its burden of proof.

Defendant has shown that the pallets did not perform properly. It has introduced uncontroverted evidence in the form of correspondence from many of the users of the pallets. Defendant also has demonstrated a rapidly increasing demand for workable pallets in the postal system. These factors demonstrate that "subjective bad faith" did not cause the termination. Rather, under pressure to provide suitable pallets in large quantities, the CO acted to protect USPS interests.

Further, the CO provided a reasonable basis for issuance of the cure notice. Plaintiff's Appendix, No. 571–88 C, filed Mar. 23, 1990 (Pl.App.), at 66. Specifically, plaintiff's product did not comply with contractual requirements. The CO's mere failure to write a memorandum for the contract file does not show abuse of discretion. In sum, then, plaintiff simply cannot show that "there is no reasonable basis for the adverse administrative decision...." *Olympia USA, Inc. v. United States*, 6 Cl.Ct. 550, 554 (1984).

### Bad Faith

■ Plaintiff further claims damages for USPS bad faith termination of the contract. Plaintiff claims anticipatory profits. Plaintiff must meet a high burden because this court assumes that the Government acts in good faith. *Torncello v. United States*, 231 Ct.Cl. 20, 45, 681 F.2d 756, 770 (1982); *Librach v. United States*, 147 Ct.Cl. 605 (1959); *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976) *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). In fact, plaintiff must establish "well-nigh irrefragable proof." *Torncello*, 681 F.2d at 770; *SMS Data Products Group, Inc. v. United States*, 19 Cl.Ct. 612 (1990). This quantum of proof requires evidence of "specific intent to injure the plaintiff." *Kalvar*, 543 F.2d at 1302; *Torncello*, 681 F.2d at 770.

As evidence of bad faith, plaintiff points to the existence of a concurrent contract with another supplier and USPS's decision

to exercise an option under a competitor's contract before plaintiff's. Plaintiff also notes that USPS has not terminated any other supplier's contract.

Plaintiff has not shown, however, that USPS acted to harm Norwood. In contrast, USPS explained that the decision to maintain concurrent contracts was necessary to acquire sufficient pallets to meet USPS needs. Def.App., at 933–36. Defendant also has shown that USPS considered terminating other suppliers. Def.App., at 910, 913. USPS ultimately decided not to terminate other contracts because the pallet defects were minor and repairable.

Plaintiff next points to the lack of quantified evidence of pallet failures as proof of bad faith. Although it has not documented the exact number of failures, USPS documented widespread failure of the pallets. Pallet users—both USPS employees and postal mailers—complained extensively of failures by mail. Further, an independent testing agency's report indicates that the plastic legs were not strong enough to prevent buckling under vibration conditions with 2,500 pound loads. Pl.App., at 104.

Finally, plaintiff points to the deposition of the USPS Planning Officer to support its bad faith argument. The Planning Officer wanted the contract terminated regardless of plaintiff's proposals to correct defects. Pl.App., at 399. Plaintiff has not shown, however, that the Planning Officer's personal bias influenced the CO. While the CO relied on input from the Logistics Planning Officer, Pl.App., at 546, the CO made the final decision. No evidence indicates that the CO intended to injure plaintiff. In sum, the actions of USPS do not show bad faith by "well nigh irrefragable proof."

## CONCLUSION

Plaintiff has not met its burden of proof. USPS, on the other hand, has shown that it had reasonable grounds for a default termination. While plaintiff delivered pallets on time, they did not meet performance requirements and consequently breached the contract's warranty of supplies. Thus, this court grants defendant's summary judgment motion on the issue of improper ter-

mination. Further, even with all the inferences drawn in favor of plaintiff, USPS has established that it did not act in bad faith in terminating Norwood's contract. Thus, defendant's summary judgment motion is granted on the issue of bad faith. This court denies plaintiff's cross-motion for summary judgment and directs the Clerk of the court to dismiss the complaint.

No costs.