**SPERRY CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 116–84C.**

United States Claims Court.

Feb. 5, 1986.

Clarence T. Kipps, Jr., Washington, D.C., for plaintiff. John L. Rice, John J. O'Connor, III, and Norman A. Steiger, of counsel.

Kathleen A. Flynn, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant. Major Gerald J. Brentnall, of counsel.

## OPINION

MOODY R. TIDWELL, III, Judge:

This action is before the court on cross-motions for summary judgment. At issue is a decision by the Armed Services Board of Contract Appeals (ASBCA or the Board) brought under the Wunderlich Act, 41 U.S.C. §§ 321 and 322 (1982), which denied the contractor's claim, plaintiff here, for equitable adjustment for alleged constructive changes in the government's application of certain test procedures and decisions having to do with the purchase of two additional option items. This court will cite facts as necessary to support its conclusions but not all of the facts as found by the Board which are artfully set out in its

decision, *Sperry Rand Corp.*, 83–2 BCA ¶ 16,841. On the basis of the administrative record, the parties' briefing and oral argument, the court concludes that as a matter of law the Board's decision is erroneous.

## FACTS

This case involves negotiated fixed-price incentive contract No. F19628–74–C–0098 executed on January 25, 1974 by plaintiff Sperry and defendant the United States, acting through the United States Air Force which required plaintiff to design, fabricate, test and deliver one LORAN–D Ground Chain (Chain 1), an advanced state-of-the-art aid to navigation systems.[1] The contract called for a significant amount of testing by plaintiff, lasting throughout the course of the contract, plus a significant amount of paperwork analysis and review, with "hands-on" effort by Air Force personnel to verify that the equipment offered met the contractual requirements and to learn to operate the equipment.[2] The tests were designed by plaintiff and approved by defendant who participated in or observed most, if not all, of the tests.

The contract also contained option provisions permitting defendant to purchase up to three additional ground chains, at set prices if purchased within a time frame set out in the contract. Defendant gave notice on July 14, 1978, that it wished to exercise its option for chains 2 and 3. Plaintiff responded by stating that by the terms of the contract defendant had 120 days from the date of acceptance of Chain 1 within which to exercise its option and that in plaintiff's opinion the 120-day option period had passed.[3] Because of defendant's need for the chains plaintiff agreed to supply chains 2 and 3 under protest and seek an equitable adjustment at a later date to cover their increased costs and time of performance. Plaintiff subsequently delivered chains 2 and 3 to defendant as well as a claim for equitable adjustment. Defendant does not agree with plaintiff that the 120-day option period had expired prior to its ordering of Chains 2 and 3 because, according to defendant, Chain 1 was not accepted until March 20, 1978, within the 120-day option period. The contracting officer denied plaintiff's claim on that basis and the ASBCA upheld the decision of the contracting officer. Plaintiff thereupon filed an appeal with this court pursuant to the Wunderlich Act, *supra*.

The Board found that the contract gave defendant the authority to exercise the options at the pre-arranged price, for Chains 2 and 3 at any time during performance of the contract but no later than 120 days after final acceptance of Chain 1 and that Chain 1 was accepted on March 20, 1978. The option was exercised on July 14, 1978, within the 120-day option period. From this issue confusion abounds. The following contractual terms and conditions bear upon the issue and are very possibly the chief causes of the mischief:

### *From the Schedule*

SECTION E—SUPPLIES/SERVICES & PRICES

1. The Contractor shall design, fabricate, test and deliver the equipment, data, and services below in accordance with the documents set forth in Section F:

0001   LORAN Ground Chain, Tactical, Transportable, 1 each (Basic with Technical Alternate 2 Configuration)

\*      \*      \*      \*      \*      \*

Subsystem Test. There were approximately 150 tests.

---

**1.** Chain 1 is actually item 0001 of the contract. Sperry was obligated to build, test and refurbish Chain 1. Chains 2, 3 and 4 were respectively items 002, 003 and 004 of the same contract.

**2.** Practically every item, configuration, etc., was covered within the contract by tests. The tests were called for as Contract Sub-Line Item No. A0006AA, Category I Test Plan/Procedures,

**3.** Plaintiff alleged that Chain 1 was accepted on February 3, 1978. There are 161 days between February 3 and July 14, 1978. For reasons that will soon become obvious, there were 135 days between March 1 and July 14, 1978.

SECTION I—INSPECTION AND ACCEPTANCE [4]

*Items*

0001 Inspection at origin. Final inspection and acceptance upon successful completion of DT & E Field Test at destination.

SECTION F—DESCRIPTION/SPECIFICATIONS

Through Section F of the Schedule the following language was added to Task 1 of the SOW (Statement of Work).

*Location of DT & E.* Field testing of the first chain is to be accomplished in S.E.U.S. (Southeastern United States) such that the location of the monitor and primary service area would be the Eglin AFB, FL area. The three transmitter sites would have to be located in S.E.U.S. such that they provide 400 mile base legs, with the open side of the TRIAD facing the Gulf of Mexico. Test sites to be selected for the DT & E testing in S.E. section of the U.S. shall be on Government-owned property.

*Refurbishment and Restoration After DT & E.* Upon successful completion of the DT & E field test (sic), the contractor shall restore the sites to the condition they were in prior to the test. Also, the contractor shall refurbish and restore, including replacement if necessary, all elements of the chain to a deliverable condition including any material and fixtures and other aspects which may have been damaged in disassembling the chain.

*Design Deficiencies.* During or subsequent to DT & E the contractor shall correct any design deficiencies.

*From the General Provisions*

TITLE AND RISK OF LOSS (1968 JUN)

(a) Unless this contract specifically provides for earlier passage of title, title to supplies covered by this contract shall pass to the Government upon formal acceptance, regardless of when or where the Government takes physical possession.

\* \* \* \* \* \*

MATERIAL INSPECTION AND RECEIVING REPORT (1969 DEC) [5]

At the time of each delivery of supplies or services under this contract, the Contractor shall prepare and furnish to the Government a Material Inspection and Receiving Report in the manner and to the extent required by ASPR Appendix I, "Material Inspection and Receiving Report."

*From the Special (or Other) Provisions*

5. ORDER OF PRECEDENCE.

In the event of an inconsistency in this contract, unless otherwise provided herein, the inconsistency shall be resolved by giving precedence in the following descending order: 1) Schedule (excluding Statement of Work, the Specifications, and Contract Data Requirements List); 2) General Provisions; 3) the other provisions of the contract whether incorporated by reference or otherwise; 4) Statement of Work; 5) Contract Data Requirements List; 6) the Specifications ...; 7) The Contractor's Technical Proposal as described in Section F.

*From the Statement of Work*

5.0 *Delivery*

5.1 Delivery dates and quantities for Development Items shall be as specified in the schedule of the contract of which this SOW is a part. Acceptance by the Government of the LORAN D Ground Chain Equipment shall be accomplished at the Configuration Item level.

5.2 Configuration Items will not be accepted until the following conditions are met.

5.2.1 The Contracting Officer has acknowledged completion of Preliminary Design Review, Critical Design Review, Functional Configuration Audits, Physical Con-

---

4. As amended by P00007, July 8, 1975.

5. The Armed Services Procurement Regulation Appendix cited in this clause requires plaintiff to proffer a document (Standard Form DD250) of which more will be said, to defendant for acceptance or rejection of any item, or for the chain in its entirety.

figuration Audit, Formal Qualification Review.

5.2.2 One or more of each Configuration Item has been qualified and tested in accordance with Government approved test plan, procedures and meet the specification requirements.

5.2.3 The Configuration Items have satisfactorily passed acceptance test in accordance with Acceptance Test Plans, Procedures, and Specifications which have been previously approved by the Contracting Officer.

5.2.4 Acceptance will take place following successful completion of DT & E and correction of design deficiencies.

7.0 *Contractor Tasks*

\* \* \* \* \* \*

7.2 *Development Test and Evaluation* The contractor shall perform development tests and evaluations as specified in Task 1 of SOW and [the] development specifications.

\* \* \* \* \* \*

7.3.2.2 *Configuration Management* The contractor shall accomplish this effort in accordance with Task 17 of this SOW.

TASK I

TEST

\* \* \* \* \* \*

6. *Acceptance* Final acceptance of all contractor provided equipment services, and materials shall be accomplished upon both the successful completion of System Tests and the clearing of all test and design discrepancies from all test phases.

7. *Configuration Audits* Functional Configuration Audits and Functional Qualification Reviews shall be conducted in accordance with Task 17 of this statement of work.

\* \* \* \* \* \*

6. As amended by P00021, June 2, 1976.

TASK 17

CONFIGURATION MANAGEMENT

\* \* \* \* \* \*

4. *Configuration Audits:*

a. *Functional Configuration Audit.* The contractor and the procuring activity shall conduct a Functional Configuration Audit on the first unit of each configuration item.... The contractor is responsible for the conduct of the audits....

b. *Physical Configuration Audit.*[6] The contractor and the procuring activity shall conduct an incremental Physical Configuration Audit on the first production unit of each configuration item.... Physical Configuration Audit on all Configuration Items shall be completed not later than "end of DT & E." ... The contractor is responsible for the conduct of the audit....

c. *Formal Qualification Review.* The contractor and the procuring activity shall conduct a Formal Qualification Review on a unit of each configuration item after successful completion of System Testing.... The contractor is responsible for the conduct of the audit....

This concludes the court's listing of pertinent contract terms.

"DT & E," mentioned above, stands for Development, Test and Evaluation. It is a process by which each item, including the whole system assembled from previously proven items is tested to assure the items and the system meet the requirements of the contract. The DT & E plans were prepared by plaintiff and approved by defendant. Plaintiff was primarily responsible for the testing, but defendant's representatives were present throughout the process. The Board found that the Physical Configuration Audit (PCA), Functional Configuration Audit (FCA) and Formal Qualification Review (FQR) were included within DT & E. PCA is designed to compare the equipment tests with the technical data described in Chain 1 and to correct any deficiencies.[7] FQR is intended to gath-

7. After finding that PCA was a part of DT & E, the Board, and the parties as well, proceeded to

er data from the different tests and review them as a whole. FCA supports FQR by examining the same test results, but is designed specifically to see whether the testing was conducted properly. Amendment P00021 changed the Statement of Work by requiring PCA on the first production unit of each component prior to completion of DT & E. The Board found that every component in Chain 1 was a configuration item.

The Board found that the DT & E Field Tests were successfully completed on February 3, 1978 and from that date until March 18, 1978 plaintiff performed refurbishment work on the equipment at the sites in preparation for the government's Initial Operating Test and Evaluation (IOT & E).[8] The Board also found that the field portion of the PCA was completed on February 9, 1978 but that PCA was not formally completed until sometime in April, 1978. FCA was completed on February 28, 1978 and FQR on March 1, 1978. Defendant's inspection was completed March 18, 1978 and on March 20, 1978 the parties executed a DD250 in accordance with the "Material Inspection and Receiving Report" clause for Chain 1. The Board thereafter concluded that the option period began to run on March 20, 1978, the date of the DD250 and that since the option was accepted on July 14, 1978, 116 days later, the option was valid and plaintiff was required to provide Chains 2 and 3 at the contract price.

In the opinion of the court the only issues in this case of any merit are legal in nature and can be determined by an analysis and interpretation of several of the specifications of the contract which might be in conflict with each other. The principal issue is: Did defendant exercise its option rights for Chains 2 and 3 within the 120-day time period?[9]

## DISCUSSION

■■■ The terms of the contract, and the Wunderlich Act[10] do not prohibit the ASBCA from making conclusions of fact and law in order to render its decisions. In truth, the Wunderlich Act gives the deci-

---

ignore its place in the acceptance process. For example, the Board found that FCA and FQR were completed prior to March 1, 1978, without noting the PCA completion date. The Board also found that plaintiff's witnesses, "advanced the position that acceptance occurred simultaneously with the conclusion of the last DT & E test. The Government's witnesses contended that the option could not begin to run until all tests and all data procedures (FCA and FQR) had been completed." (Transcript citations omitted.)

8. It was intended by defendant under IOT & E to have it's personnel operate Chain 1, with support from plaintiff's personnel. The IOT & E started on March 21, 1978 and lasted for 61 days, until May 21, 1978. It is interesting to note that there were 81 days between March 1 and May 21, 1978, and 102 days between February 3 and May 21, 1978. Both within the 120-day option period.

9. The Board listed three issues described thusly:
   1. What was the impact of the implementation of the new billing schedule contained in the DD250 executed on 29 March 1977?
   2. What impact did completion of the last DT & E field test, (sic) on 3 February 1978, have on commencement of the period within which the Government could exercise its option to purchase additional LORAN chains?

3. If the option period did not begin on 3 February 1978, on what date did it commence and what event marked that milestone?

10. The Wunderlich Act, 41 U.S.C. §§ 321 and 322 (1982) provide:

§ 321. *Limitation on pleading contract-provisions relating to finality; standards of review*
   No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.
§ 322. *Contract-provisions making decisions final on questions of law*
   No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

sion of a Board finality unless the decision is fraudulent, capricious, arbitrary, so grossly erroneous as to necessarily imply bad faith, or is not supported by evidence. 41 U.S.C. § 321 (1965). This court in reviewing the factual findings of the Board must accept the findings as final and conclusive even if the court would not have reached the same findings or conclusions. *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Tagg Brothers & Moorhead v. United States*, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524 (1930); *Marley v. United States*, 191 Ct.Cl. 205, 423 F.2d 324 (1970); *Southwest Welding & Manufacturing Co. v. United States*, 188 Ct.Cl. 925, 413 F.2d 1167 (1969). This is a very difficult standard to meet; however it would be incorrect to conclude that the court is powerless to redress a wrong or that an appeal to the court is a useless act. The interpretations of law made by the Board and applied to the facts are not accorded the finality by the Wunderlich Act that the Board's factual determinations receive. *BCM Corp. v. United States*, 2 Cl.Ct. 602 (1983); *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 389 F.2d 424 (1968). *In Donald M. Drake Co. v. United States*, 194 Ct.Cl. 549, 439 F.2d 169 (1971), the court stated that board decisions on "questions of law are open to independent judicial consideration." *Id.* at 552, 439 F.2d at 171. Because the interpretation of specifications is a legal matter finality thereupon is reserved to the courts. The court may agree with the legal interpretations made by a Board of Contract Appeals because such interpretations are a necessary adjunct to the Board's ability to reach its decision. *C.J. Langenfelder & Sons, Inc. v. United States*, 169 Ct.Cl. 465, 341 F.2d 600 (1965). The Board's legal interpretations, including the interpretation given specifications, must be examined, but with respect and dignity, given the overall degree of expertise of the ASBCA in this area of the law. *George Hyman Construction Co. v. United States*, 215 Ct.Cl. 70, 564 F.2d 939 (1977). Oftentimes the expertise of a Board in such matters can be

helpful to the court. *Icono v. United States*, 6 Cl.Ct. 149 (1984), *aff'd*, 770 F.2d 179 (Fed.Cir.1985). *See also, Hegeman-Harris & Co. v. United States*, 194 Ct.Cl. 574, 440 F.2d 1009 (1971). *Copco Steel & Engineering Co. v. United States*, 169 Ct.Cl. 601, 341 F.2d 590 (1965), which is factually similar to the case at bar, held that the search for the acceptance date of items under a government contract must of necessity begin with a search for the date from which the clock began to run on the option item(s); a question of law for decision by the court. *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429–30 (1968), stated that questions of when an option period commenced and how options were to be exercised were legal issues of contract interpretation—and not factual issues. The court said:

> The Board cannot convert these clearly legal issues of contract interpretation into factual issues simply by resolving them in terms of the intent of the parties....
>
> .... If the Board could make binding decisions on matters of contract interpretation merely by speaking in terms of the intent of the parties, the Wunderlich Act would be robbed of much of its purpose. Accordingly, this court is not bound by the Board's decision, but is free to decide this case in accordance with its own view of the law.

*Id.* at 72, 389 F.2d at 429–30.

Both parties, the Board and the court all agree that the contract clearly provided that the defendant could exercise its option for Chains 2 and 3 at any time during performance of the contract and for a period of time not exceeding 120 days after final acceptance of Chain 1. The difficulty with this seemingly simple issue is in establishing the date of final acceptance of Chain 1. Plaintiff claims that the following term in the contract Schedule, as amended, is of great probative value in making this determination:

Inspection at origin. Final inspection and acceptance upon successful completion of DT & E Field Test at destination.

Plaintiff advocates that this means just what it says; final acceptance occurs when the DT & E Field Test is successfully completed. Defendant is just as adamant that an interpretation of the entire contract shows that final acceptance did not occur until the DD250 was signed by defendant's Program Director.

Plaintiff has asked the court to ascertain the intent of the parties in order to properly interpret the contract. This, the court will not do for the reasons set out in *Dynamics Corp. of America v. United States,* 182 Ct.Cl. 62, 67, 72, 389 F.2d 424, 429–30 (1968). What the court will do is review the decision of the ASBCA which will include an analysis of the intent of the parties, as well as other factors. The Board properly concluded that in order to resolve the dispute the contract must be interpreted to give effect to all parts of the agreement if possible and bring seemingly disparate provisions to read as one. *SCM Corp. v. United States,* 230 Ct.Cl. 199, 675 F.2d 280 (1982); *Merando, Inc. v. United States,* 201 Ct.Cl. 28, 475 F.2d 603 (1973). The general rule is that contracts are to be read as a whole so as not to leave one or more terms meaningless or useless. *Astro-Space Laboratories, Inc. v. United States,* 200 Ct.Cl. 282, 470 F.2d 1003 (1972); *Jamsar, Inc. v. United States,* 194 Ct.Cl. 819, 442 F.2d 930 (1971). "[T]his court must be guided by the well-accepted and basic principle that a contract should be interpreted to give effect to all parts of an agreement. An interpretation which gives reasonable meaning to all provisions is preferred to one which renders a provision useless or meaningless." *SCM Corp. v. United States,* 230 Ct.Cl. 199, 203–04, 675 F.2d 280, 283 (1982). The court in *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 591 F.2d 629 (1979), perhaps said it best:

Provisions of a contract must be construed so as to effectuate the spirit and purpose of the contract. The agreement must be considered as a whole, and inter-preted so as to harmonize and give meaning to all its provisions.

*Id.* at 82, 591 F.2d at 633.

At times, however, the terms of a contract are so disparate that they cannot be read together and interpretive procedures must be used to find the proper interpretation. One interpretive procedure which could be used in the absence of any guidance from within the contract itself is the rule of *contra proferentem* which seeks to resolve the ambiguity by construing offending terms in a contract against the drafter of the language which is usually, but not always, the government. *Department of Natural Resources & Conservation v. United States,* 1 Cl.Ct. 727, 737 (1983); *WPC Enterprises v. United States,* 163 Ct.Cl. 1, 323 F.2d 874 (1963). When the government drafts the contract and uses language that is susceptible to more than one meaning and the intention of both parties is not discernible, the meaning given it by the contractor will prevail. The rule of *contra proferentem,* "puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party ...." *Sturm v. United States,* 190 Ct.Cl. 691, 421 F.2d 723 (1970); *see also Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390, 418 (1947).

Another interpretive procedure is when the parties by mutual consent, prior to the execution of a contract, agree upon a scheme for interpreting the contract should it be discovered at a later date that one or more terms must be rendered useless and meaningless because it or they are so disparate they cannot be read together. One popular format for this is a separate contract clause stating which terms have precedence over other terms.

As plaintiff accurately points out, the parties in this case agreed in the Order of Precedence clause contained in the Special (or Other) Provisions of the contract that certain terms of the contract would have precedence over other terms in the event of any inconsistency. Its purpose is such that if there are inconsistencies within the terms of the contract subordinate clause(s)

must bow to and be disregarded when there is an inconsistent higher priority clause in the contract. As noted in *John A. Volpe Construction Co.*, 68–1 BCA ¶ 6857, an Order of Precedence clause "has been consistently recognized as a legally valid and fully effective agreement by the parties as to how their contract is to be interpreted." *Id.* The Board, in the instant case, found it possible to "harmonize all contract provisions relating to inspection, testing, delivery and acceptance without creating conflicts between them or rendering some of the provisions meaningless." The court is not as sanguine.

The contract Schedule stated that final inspection and acceptance of Chain 1 would occur upon successful completion of the DT & E Field Test. Depending upon what was included in the DT & E Field Test that test was completed either on February 3 or March 1, 1978. Subordinate terms, as per the Order of Precedence Clause contained in inconsistent acceptance terms, such as terms which forbade acceptance until (1) the contracting officer had acknowledged completion of the Preliminary Design Review, Critical Design Review, Functional Configuration Audits, Physical Configuration Audit and the Formal Qualification review; (2) each item had been tested successfully; (3) DT & E had been successfully completed; and (4) design deficiencies corrected; and (5) a properly filled out DD250 was executed.

The court need go no further to show inconsistent terms of the contract that cannot be harmonized. Consider: one term of the contract specifies acceptance upon successful completion of the DT & E Field Tests. Another forbids acceptance until all tests and audits are final, DT & E is completed, all design deficiencies corrected, and a DD250 executed. The court notes that the former term referred to the DT & E Field Test and the latter to DT & E without the modifier "Field Test" which,

we assume, presupposed some higher level or final test, as opposed to a field or intermediate test even though there was no higher level DT & E referenced in the contract. Common sense tells us that a DT & E Field Test is not the same as an unmodified DT & E, which would read "Final DT & E," or something akin to that. Even the Board was concerned with what constituted "finalization of DT & E." Either Chain 1 was accepted at the time of completion of DT & E Field Tests, or following formal completion of several other items, including the completion of design deficiencies even though under a separate provision plaintiff was required to correct design deficiencies as a part of its warranty. The "Order of Precedence" clause was designed expressly to address this kind of inconsistency. As we have said, an interpretation which would give a reasonable effect to all parts of the contract is clearly preferred to one which leaves a part of the contract useless, but this result is sometimes impossible to reach. Government contracts are long and complex and the draftsmanship oftentimes displays a deplorable lack of care by the drafters, as appears here. When terms of a contract are inconsistant, and each could be dispositive, an order of precedence must be established.[11] Hence, the "Order of Precedence" clause. *See* Restatement (Second) & Contracts § 229(a) (Tent.Draft, 1973).

Inasmuch as the purpose of determining the acceptance date of Chain 1 is to discover the beginning date of the 120-day option period the court is bound to construe the terms of the contract strictly. Indeed, the general attitude of the courts and the ASBCA is to strictly construe contractual option provisions because the options subject contractors to potentially major risks which should not be extended beyond the limits the contractor had agreed to accept. In one instance, the ASBCA refused to

---

**11.** "Inconsistent" is defined as "[m]utually repugnant or contradictory; contrary, the one to the other, so that both cannot stand, but the acceptance or establishment of the one implies the abrogation or abandonment of the other;

as, in speaking of 'inconsistent defenses,' or the repeal by statute of 'all laws inconsistent herewith.' " *Blacks Law Dictionary*, 689 (rev. 5th ed. 1979).

uphold the agency's exercise of an option because the exercise was one day late. *Space-Age Engineering, Inc.*, 78–2 BCA ¶ 13,543.

In the instant case, the ASBCA determined that it was not required to interpret the contract option provisions but, rather, the term "final acceptance," as used in the Inspection and Acceptance clause and that, therefore, "the strict interpretation rules, whatever they may mean in this context, are not applicable." The court disagrees. The final acceptance language of the Inspection and Acceptance clause of the contract was an integral part of the option provision inasmuch as the trigger date for the 120-day option period was the date Chain 1 was finally accepted. Because this is a question of contract interpretation the court is not bound by the Board's interpretation, but is free to decide this case in accordance with its own view of the law. *International Telephone & Telegraph v. United States*, 197 Ct.Cl. 11, 453 F.2d 1283 (1972). *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 389 F.2d 424 (1968).

The court finds that the various terms affecting and defining acceptance of Chain 1 cannot be interpreted so as to give them all effect. The terms cannot merely be read as appearing to be conflicting and then tinkered with, such as by reading them out of context, ignoring their plain meaning, etc. The acceptance terms of this contract are inconsistent and one or more must fall.

The court agrees with the Board's conclusion that FCA, FQR and PCA were part of DT & E. The Board found that FCA and FQR were both completed prior to March 1, 1978. PCA was conditionally approved in early February 1978. The reason it was not unconditionally approved was because there were some discrepancies between the drawings and the equipment, but not so great as to cause rejection. The Board found that PCA was formally com-

pleted sometime in April 1978, but notwithstanding the lack of formal completion, defendant conducted IOT & E based upon the PCA conditional approval. The record below shows that conditional approval of PCA was made on February 9, 1978 and that defendant went forward with IOT & E prior to formal PCA acceptance because the discrepancies were so minor that IOT & E could be conducted safely while plaintiff continued to check the drawings against the actual equipment. The significance of this issue goes to the Board's finding that the contract was accepted on March 20, 1978, when a DD250 was executed for Chain 1. The court agrees with the Board that final acceptance occurred prior to formal completion of PCA in April, 1978.

The Board ignored a stipulation reached by the parties at the administrative level ostensibly because it was not necessary to support the decision reached by the Board. Under the court's view the stipulation is important. The stipulation read that if FCA and FQR were found by the Board not to be part of DT & E tests then DT & E testing was completed on February 3, 1978, if they were found to be part of DT & E tests then DT & E testing was completed on March 1, 1978. The significance of the February 3, 1978 date is that on that day plaintiff completed all of the tests identified as tests in the Statement of Work, Task No. 1, Test. The Board found that FCA and FQR were completed subsequent to February 3, 1978 but on or prior to March 1, 1978. PCA was not referred to again.[12] The court must hold that all tests, including especially, DT & E Field Tests were completed by March 1, 1978. The stipulation of the parties was improperly ignored by the Board and, at the least, should have been addressed. In *Gresham & Co. v. United States*, 200 Ct.Cl. 97, 470 F.2d 542 (1972), our predecessor court held that a stipulation of the parties is dispositive of the issue of whether government inspectors agreed with the contractor's in-

12. It is readily apparent to the court that PCA is a component part of FQR and since FQR was completed prior to March 1, 1978 the condition-

ally accepted status of PCA must have been sufficient to the parties, and the Board, and, it should be added, the court.

terpretation of the specifications because a "stipulation is a judicial admission binding on the parties ...." *Id.* at 112, 470 F.2d at 551. It is binding on the Board and it is binding on this court in the absence of any factors to the contrary such as coercion, fraud, impossibility, etc.

■ The court is well aware that its conclusions, so far fly in the face of the Board's legal conclusion that Chain 1 could only be accepted by the proper execution of a DD250 following some undesignated period of time for defendant to contemplate the effects of the test results. The court disagrees with both conclusions. It may well be that execution of a DD250 is the generally recognized method for acceptance of an item in government contracting but this ignores the fact that the parties may, as they did here, mutually agree to another form of acceptance, *i.e.,* the event of completion of the DT & E Field Tests. The court also sees no reason why the parties could not agree to acceptance automatically predicated upon the same or some other event. Legal precedent establishes that there is no requirement that government acceptance be accomplished only by the joint execution of a formal DD250. Acceptance may be effected upon the happening of a stated event. *See Raymond-Kaiser-Macco-Puget Sound,* 66–1 BCA ¶ 5,498, where acceptance occurred upon the final inspection at a contractor's plant as provided in the contract because the final inspection disclosed no defects and regardless of the fact that the DD250's executed by the government stated that the inspection did not constitute government acceptance. *Tro-Tech Inc.* 68–1 BCA ¶ 6,828, held that where there was no formal written acceptance by the government, the Board nevertheless properly found that government acceptance was effected by inspection and payment where a contract provision baldly stated, "[a]cceptance will be the date the Veterans Administration receives satisfac-

tory inspection or test report" (sic). There is no merit to the argument that to permit the parties to agree to their own manner of acceptance is improper because it would read out of the contract the "Material Inspection and Receiving Report" clause. The right of the parties to agree to ignore the clause is a valid right under the other terms of the contract and procurement law. The contract, as amended, made practically every item, subassembly audit, configuration, and so forth, subject to a separate test both individually and as assembled.[13] That being the case and following the Board's views a DD250 would have to be executed for most of those bits of the whole, which would have conceivably amounted to hundreds if not thousands of proffers and acceptances under the "Material Inspection and Receiving Report" with a corresponding DD250 for each. There is no evidence that such activity ever occurred.

■ Moreover, the Board distilled from the contract that defendant did not intend for acceptance to be automatic upon the occurrence of successful completion of the DT & E Field Test, but that a completed DD250 at some unidentified later point in time was necessary to denote formal acceptance. We have dealt sufficiently with the latter issue. The Board looked at the word "upon" in the phrase "upon successful completion of DT & E Field Test," [14] and found that the word could be defined several different ways, such as, "at this moment" to "in the very near future." The Board did find that it could not support an interpretation of "upon" as synonymous with the occurrence of a particular event and not bureaucratically recorded by the proper officer on a correctly completed DD250. We disagree. Acceptance of Chain 1 occurred on March 1, 1978 and whether a DD250 was issued that day is irrelevant. The court finds that "upon" can mean many things and must be inter-

---

13. "Assembled" in this sense does not mean just the entire Chain 1; it also includes subassemblies of many units less than the whole.

14. From the Schedule, Section I—INSPECTION & ACCEPTANCE, "Inspection at origin. Final inspection and acceptance *upon successful completion of DT & E Field Test,* at destination." (Emphasis added.)

preted in light of its usage. In the context in which it is used in this case, the court finds that "upon," contrary to the Board's conclusion, means "now," concurrent with the successful conclusion of the DT & E Field Test. The court can easily understand why defendant wanted a completed DD250 to record the March 1, 1978 acceptance because the voluminous amount of information contained in it would clearly be to defendant's benefit. *See* ASPR § 30.8 Appendix I (1968).[15] The Board also concluded that the contract mandated that inspection must precede acceptance, citing the title and order of language in the Inspection and Acceptance clause of the General Provisions and the operative language of the contract schedule term controlling in this instance, that requires "[f]inal inspection and acceptance upon successful completion of DT & E Field Test at destination." This is not correct. At times, in government contracts acceptance may precede final inspection, but more importantly, the argument is moot. It has nothing to do with the ultimate decision; Chain 1 was accepted on March 1, 1978 even though plaintiff was obligated by the terms of the contract to continue unfinished tasks.[16]

One task which continued was refurbishment of land and Chain 1. "Section F—Description/Specifications" of the contract Schedule required plaintiff to restore and refurbish the land and Chain 1, "[u]pon successful completion of the DT & E field test [sic]." The clause continued, that plaintiff was to "refurbish and restore, including replacement (sic) if necessary all elements of the chain to a deliverable condition including (anything) ... which may have been damaged in disassembling the chain 1 ...." Again, the Board has made the same error. It concluded that defend-

ant's position was correct; that Chain 1 could not be accepted before refurbishment was completed and that refurbishment was a part of DT & E. The court again understands why defendant would probably have liked Chain 1 completely refurbished before acceptance, but that is not what it contracted for. Defendant received from plaintiff exactly what the contract called for, *i.e.*, refurbishment of the chain after successful completion of the DT & E Field Test. Defendant has been in the business of writing contracts for over 200 years and is capable of drafting contract language to describe accurately what it wants. To state otherwise is disingenious. It is also not lost on the court that defendant did reserve to itself 120 days after acceptance of Chain 1 to evaluate the Chain, train military personnel to operate it (IOT & E), complete more testing and documentation, permit refurbishment, replace damaged parts (though this item was covered under the warranty provisions of the contract) and myriad other items of unfinished work. It is not that defendant did not have other options for accomplishing these goals. For example, defendant could have keyed acceptance to a later event than DT & E, or it could have allowed itself more time for the completion of any possible unfinished work by the contractor or itself, and as a corollary thereto, more time within which to make the decision of whether to exercise the option.

The final finding of the Board was that plaintiff maintained site security at the site(s) until March 18 or 20, 1978 thereby manifesting that acceptance by defendant had not occurred prior thereto. When plaintiff gave notice that it planned to withdraw its guard force on or about February

---

**15.** The court sees no reason why a properly completed DD250 could not be executed at a later date to memorialize the earlier acceptance and to acquire the information required in a DD250.

**16.** Plaintiff also alleges that the argument of whether inspection had to precede acceptance was raised by defendant as a "straw man" because inspection took place at its plant prior to delivery, and as required by the contract. The

court will not consider this argument because it need not do so to resolve the appeal. The Board's address to this issue would lead you back to section 5.2 of the Statement of Work which forbids acceptance before inspection. The reader will remember that the court found section 5.2 of the Statement of Work to be subservient to and, in this instance, nullified by the Schedule.

3 and March 1, 1978 because Chain 1 had been accepted, defendant refused to accept the responsibility for security, and so told plaintiff. The court believes as a result, plaintiff was forced by economic considerations to continue providing site security as it was required to do under the contract. Plaintiff had not been totally paid for its work on the contract and expensive equipment of its own and defendant's was on the site(s). Plaintiff's actions were completely reasonable in these circumstances. Defendant, operating under the false premise that it had not accepted Chain 1 until March 20, 1978, naturally refused responsibility for site security because, had it done so, that action would have presaged defendant's control over the real and personal property and have been inconsistent with defendant's litigation position, that during the first few weeks of March 1978 it had not accepted Chain 1.

We have answered two of the three issues posed by the Board. Issue two asked, "[w]hat impact did completion of the last DT & E field test [sic], on 3 February 1978, have on commencement of the period within which the Government could exercise its option to purchase LORAN chains?" The answer is none, because the DT & E Field Test was not completed until March 1, 1978. The 120-day option period on Chains 2 and 3 began running concurrently with the March 1, 1978 automatic acceptance by defendant of Chain 1. Issue three was, "[i]f the option period did not begin on 3 February 1978, on what date did it commence and what event marked that milestone?" The option period began on March 1, 1978 as determined by the parties in the pertinent stipulation of facts and the Inspection and Acceptance Clause of the contract, as amended, which established the acceptance date of Chain 1 and the beginning of the option period as the day DT & E was successfully completed at destination.

The Board also asked "[w]hat was the impact of the implementation of the new billing schedule contained in the DD250 executed on 29 March 1977?" We agree with the Board on this issue. Briefly, plaintiff apparently encountered money-flow problems and requested, on March 29, 1977, that defendant revise the billing schedule. This was done through the submission of a DD250 (which exemplifies the confusion surrounding the use of DD250's). Defendant then issued amendment P00023 which divided line item 0001 (Chain 1) into three separate parts. This particular DD250 was addressed to line item 1.1 "Design, Develop, Fabricate and in Plant Test one each [LORAN CHAIN]." Plaintiff argued to defendant and the Board that the signature of defendant's Systems Program Director on that particular DD250 started the 120-day option period. The Board and this court disagree with plaintiff. The execution of the System Program Director only operated to acknowledge the new billing schedule set out in the DD250. Plaintiff's argument carries no weight.

## CONCLUSION

This case has been complex, complicated all the further, by a poorly drafted contract and an extremely well-crafted Board opinion that this court was required to disagree with, as a matter of law, on several issues including the primarily dispositive one; the date of acceptance of Chain 1 by defendant which started the running of the option period for Chains 2 and 3. That date was March 1, 1978 meaning, therefore, that the option was executed 135 days after acceptance of Chain 1. Accordingly, for the reasons given in this decision, plaintiff's Motion for Summary Judgment is granted; defendant's Cross-Motion for Summary Judgment is denied; the decision of the Armed Services Board of Contract Appeals is reversed and plaintiff is entitled to recover. The case is remanded to the ASBCA for further proceedings in accordance with RUSCC 60.1 and the holdings of this court and, as relevant to the determination of quantum. The proceedings in this court shall be stayed for a period of six months, or such other time as the court may allow upon motion of either party as the needs of this case may require. Counsel for plaintiff shall provide the court with a status

report beginning 90 days from the issuance of this decision and every 30 days thereafter.

IT IS SO ORDERED.