**SPERRY CORPORATION,**
**Plaintiff–Appellee,**

v.

**The UNITED STATES,**
**Defendant–Appellant.**

**No. 87–1475.**

United States Court of Appeals,
Federal Circuit.

April 21, 1988.

Clarence T. Kipps, Miller and Chevalier, Washington, D.C., argued for plaintiff-appellee. With him on the brief were John Lloyd Rice and John J. O'Connor, III, Washington, D.C. Also on the brief were Bernard Fried and Norman A. Steiger, Unisys Corp., Great Neck, N.Y., of counsel.

E. Kathleen Shahan, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With her on the brief were Richard K. Willard, Asst. Atty. Gen. and David M. Cohen, Director, Washington, D.C. Also on the brief was Lt Col. William M. Henabray, Dept. of the Air Force, Washington, D.C., of counsel.

Before FRIEDMAN, NEWMAN and BISSELL, Circuit Judges.

FRIEDMAN, Circuit Judge.

The sole question in this case, here on the government's appeal from the United States Claims Court, is whether the government's exercise of an option to purchase additional items under a procurement contract was timely. The contract required the government to exercise the option within 120 days of the government's acceptance of the product that was the subject of the contract, and the issue is the date of acceptance. The Claims Court, reversing the decision of the Armed Services Board of Contract Appeals, held that the government's exercise of the option was untimely. *Sperry Corp. v. United States*, 9 Cl.Ct. 488 (1986). We reverse, concluding that the exercise was timely.

I

A. In January 1974, the government executed a contract with the appellee, Sperry Corporation, that required Sperry to design, fabricate, test and deliver one LOR-AN–D ground chain (Item 0001). This item was an advanced transportable, computer controlled, solid state long-range navigation (LORAN) system. The equipment transmits signals that can be received aboard aircraft, ships, or manpacks. The receiver determines locations by interpreting the time differences between precisely controlled pulses from the transmitters.

The contract called for a significant amount of testing by Sperry, lasting throughout the contract period. The tests were designed by Sperry and approved by the government, which participated in, or observed most, if not all, of the tests. Participation in the tests by Air Force personnel was intended to enable them to learn to operate the system and to verify that the equipment met the contractual requirements.

Development, Test and Evaluation (DT & E) is a process by which each item, including the whole system assembled from previously proven items, is tested to assure that the items and the system meet the

requirements of the contract. The Physical Configuration Audit is designed to compare the equipment tests with the prescribed technical data and to correct any deficiencies. The Formal Qualification Review (Qualification Review) is intended to gather data from the different tests and review them as a whole. The Functional Configuration Audit examines the test results to determine whether the testing was conducted properly.

The final delivery date under the contract (as modified) was May 15, 1978. DT & E field tests were completed February 3, 1978. The field portion of the Physical Configuration Audit was completed February 9, 1978. The Functional Configuration Audit was completed February 28, 1978, and the Formal Qualification Review was completed by March 1, 1978. Between February 3 and March 18, 1978, Sperry refurbished the site on which the tests were completed and the equipment. The government made its final inspection from February 27 to March 18, 1978, and on March 20, 1978, it executed a DD Form 250 accepting the chain.

B. The contract "granted to the government the option to purchase up to three additional LORAN–D Ground Chains (Chains 2, 3, and 4) at prices specified in the contract. The option had to be exercised 'within 120 days after final acceptance by the Government of Item 0001 [chain one]....' " *Sperry Rand Corp.,* 83–2 B.C.A. (CCH) ¶ 16,841 at 83,787 (ASBCA Sept. 27, 1983). Contending that it had finally accepted the LORAN–D on March 20, 1978, when it executed the DD Form 250, the government exercised the option for two additional chains on July 6, 1978, within 120 days of the date of that acceptance.

Sperry responded that the government finally had accepted the LORAN–D upon completion of the DT & E field tests on February 3, 1978, so that the government had failed to exercise the option within 120 days. Sperry interpreted the government's exercise of the option as a constructive change in the contract entitling it to an equitable adjustment in the contract price.

Sperry supplied chains 2 and 3 under protest.

Sperry filed a claim with the contracting officer for an equitable adjustment. The contracting officer denied the claim. In a lengthy opinion the Armed Services Board of Contract Appeals (Board) (with one of the five members dissenting) denied the appeal.

Sperry sought review in the Claims Court pursuant to the Wunderlich Act, 41 U.S.C. § 321 et seq. (1982). The Claims Court reversed the decision of the Board and remanded for a determination of damages. The Claims Court subsequently entered final judgment against the United States in the amount stipulated by the parties.

Because the numerous contractual provisions involved are complicated and best understood in the context of the facts of the case, we describe those provisions in connection with our discussion of the legal issues in part II.

II

The linchpin of the Claims Court decision that the government did not timely exercise its option and Sperry's defense of that ruling is the following provision contained in a section of the contract called the Schedule:

0001 Inspection at origin. Final inspection and acceptance upon successful completion of DT & E Field Test at destination.

Sperry contends that under this provision "[f]inal ... acceptance" of the contract by the government occurred automatically upon the successful completion of the DT & E field testing on February 3, and that this date was the beginning of the government's 120–day period for exercising the option. Sperry then refers to Special Provision 5 of Section J of the contract, ORDER OF PRECEDENCE, which states:

In the event of an inconsistency in this contract, unless otherwise provided herein, the inconsistency shall be resolved by giving precedence in the following descending order: 1) Schedule (excluding Statement of Work, the Specifications,

and Contract Data Requirements List); 2) General Provisions; 3) the other provisions of the contract whether incorporated by reference or otherwise; 4) Statement of Work; 5) Contract Data Requirements List; 6) the Specifications . . .; 7) The Contractor's Technical Proposal as described in Section F.

According to Sperry, the "Order of Precedence" clause makes the "Inspection at Origin" clause, as Sperry interprets that clause, controlling in resolving any inconsistencies between the "Inspection at Origin" clause and the other provisions of the contract upon which the Board relied in its decision.

■ We conclude, however, that the "Inspection at Origin" clause does not have the effect that Sperry ascribes to it. Instead, it merely specifies the time when and the place where the government affirmatively finally will inspect and accept the LORAN 1 chain. Moreover, under our view of that clause, there is no "inconsistency in this contract" that requires resort to the "Order of Precedence" clause. The Board correctly concluded that

it is possible to harmonize all contract provisions relating to inspection, testing, delivery and acceptance without creating conflicts between them or rendering some of the provisions meaningless. In the absence of conflict, the "Order of Precedence" clause need not be called upon to establish the alleged primacy of the schedule "Inspection and Acceptance" provision [Section I] over general provisions and specifications as suggested by appellant [Sperry] and in the dissenting opinion.

*Sperry Rand Corp.,* 83–2 B.C.A. (CCH) ¶ 16,841 at 83,799 (ASBCA Sept. 27, 1983) (citations omitted).

■ Various clauses in the contract, read in combination, show that the government finally accepted the LORAN 1 chain on March 20, 1978, when it signed the DD Form 250. This conclusion accords with the parties' interpretation of those provisions during the performance of the contract. The result of our holding that the government finally accepted the LORAN 1

chain on March 20, 1978, is that the government's exercise of the options was timely because it took place within 120 days of that acceptance.

A. The contract incorporated the Armed Services Procurement Regulations (ASPR) (which have been succeeded by the current Federal Acquisition Regulations), including ASPR 14–1001.6 and ASPR 14–306, which stated:

14–1001.6

Acceptance means the act of an authorized representative of the Government by which the Government assumes for itself, or as agent of another, ownership of existing and identified supplies tendered or approves specific services rendered, as partial or complete performance of the contract on the part of the contractor.

14–306

(b) Depending upon the provisions of the contract, acceptance may be effected prior to, at the time of, or after delivery. Acceptance shall ordinarily be evidenced by execution of an acceptance certificate on the applicable inspection and receiving report form (DD Form 250, DD Form 115, or Standard Form 44). . . .

Read in the light of this and other provisions of the contract, the "Inspection at Origin" clause does not provide that completion of DT & E testing itself constituted final acceptance by the government. Nor does that clause indicate that the parties intended in this contract to depart from the usual procedure that government acceptance would "be evidenced by execution of an acceptance certificate on the applicable inspection and receiving report form [here DD Form 250]."

Although not a model of draftsmanship, the "Inspection at Origin" clause does two things: it specifies the time at which ("upon successful completion of DT & E field tests") and the place where ("at destination") final inspection and acceptance shall take place. The clause, like some contract clauses, contains no verb, but inherent in the provision are the words "shall take place" following "final inspection and

acceptance." The word "upon" generally is susceptible to different interpretations but in this context we think it means "shortly afterward."

The identical language is used in section F of the contract, which states in pertinent part:

Upon successful completion of the DT & E field test, the contractor shall restore the sites to the condition they were in prior to the test.

Since this provision requires Sperry to take affirmative action to restore the test site to its former condition, the word "upon" necessarily means "shortly afterward." The identical word in the identical language of the "Inspection at Origin" clause should be given the same meaning unless there were clear indication that the parties intended it to have a different meaning. *See Peerless Casualty Co. v. Mountain States Mutual Casualty Co.*, 283 F.2d 268, 276–77 (9th Cir.1960). There is no indication that the parties so intended. Indeed, if the "Inspection at Origin" clause had been intended to have the meaning that Sperry and the Claims Court would give it, one would have thought it would have stated: "The successful completion of DT & E Field Tests shall constitute final inspection and acceptance."

Other provisions of the contract indicate that final inspection by the government required some affirmative action and did not occur automatically upon successful completion of the DT & E field test. Subparagraph (a) of the General Provisions of the contract under the category "INSPECTION" states: "All supplies (which term throughout this clause includes without limitation ... end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to acceptance."

Subparagraph (a) in the General Provisions under the category "TITLE AND RISK OF LOSS" states: "Unless this contract specifically provides for earlier passage of title, title to supplies covered by this contract shall pass to the Government upon formal acceptance, regardless of when or where the Government takes physical possession."

These two paragraphs require that there will be "inspection and test by the Government ... prior to acceptance" and that there will be a "formal acceptance" by the government.

Finally, in the "Statement of Work" category, paragraph 5.2.4 provides:

Acceptance will take place following successful completion of DT & E and correction of design deficiencies.

This latter provision, which specifically deals with the subject of "acceptance," shows that the parties contemplated and intended that acceptance would take place "following" successful DT & E testing. This provision necessarily rested on the assumption that the government would take affirmative action to accept. It is inconsistent with Sperry's view that acceptance took place immediately and automatically upon successful completion of the DT & E field tests. As the Board stated:

These acceptance tests were the conduct constituting "final inspection" within the meaning of Section I of the contract schedule. As such, inspection was completed only when the acceptance tests had been performed. The SPD confirmed delivery and acceptance at the destination by his signature on the DD250 (Finding 39)....

. . . .

However, it is important to note that acceptance not only follows delivery, but also is not contemplated to occur until all required inspection (including testing) has been completed. This is not only mandated by the "Inspection" clause, but also by Section I of the contract schedule that requires "[f]inal *inspection and acceptance* upon successful completion of DT & E Field Test at destination."

*Id.* at 83,797 (emphasis in original).

In sum, we agree with the Board that the government's "final acceptance" did not occur until the government executed the DD Form 250 on March 20, 1978. As the Board stated, "[t]his was the 'conclusive and decisive action by the Government

upon which it determines through its authorized agents that, on the basis of all the facts within its knowledge, the contractor has satisfactorily performed his obligations under the contract.'" 83–2 B.C.A. (CCH) ¶ 16,841 at 83,799 (citation omitted). The Board determined that "the contract established a well-defined procedure from inspection to acceptance and we can find no indication that the parties intended to discard these contractual steps." *Id.* at 83,-796–97.

B. Alternatively, Sperry argues, as the Claims Court held, that the government's acceptance took place on March 1, 1978, which still would make the government's exercise of the option untimely. According to the Claims Court and Sperry, all of the testing was completed by that date and the government's acceptance took place at that time. The Claims Court held, and Sperry argues, that refurbishment of the chain was not necessary to acceptance, and the government "received from plaintiff exactly what the contract called for, *i.e.,* refurbishment of the chain after successful completion of the DT & E Field Test." *Sperry Corp. v. United States,* 9 Cl.Ct. 488, 498 (1986). As the Claims Court viewed the situation, "Chain 1 was accepted on March 1, 1978 even though plaintiff [Sperry] was obligated by the terms of the contract to continue unfinished tasks." *Id.* at 498 (footnote omitted).

■ We agree with the Board's reasoning in rejecting that contention:

There is nothing to indicate that the parties contemplated acceptance of the entire system when equipment was only partially refurbished or refurbishment had been completed at some of the sites.... The fact that the parties recognized that refurbishment of the equipment at all sites would have to be accomplished before acceptance is shown by the requirement to have the equipment in "deliverable condition" as a result of refurbishment. Delivery of the system had to occur before acceptance, and thus refurbishment also had to be completed at that point.

*Sperry Rand Corp.,* 83–2 B.C.A. ¶ 16,841 at 83,798.

Moreover, this contention is subject to the same fatal infirmity as the argument that the government's acceptance occurred on February 3, 1978, namely, that under the "Inspection at Origin" clause, the government's acceptance occurred automatically when the DT & E field tests successfully were completed and did not require any further affirmative action by the government. The same reasoning that led us to reject the contention that the government accepted on February 3, 1978, also requires rejection of the claim that in any event acceptance took place on March 1, 1978.

■ C. Finally, our interpretation of the contract accords with the views expressed by the parties during performance of the contract that acceptance would require some affirmative action by the government and would take place only when the government executed a DD Form 250. That fact is a relevant consideration in interpreting the contract. *General Warehouse Two, Inc. v. United States,* 389 F.2d 1016, 1020, 188 Ct.Cl. 180 (1967) and cases cited.

In Sperry's Production Progress Report of November 1977, Sperry stated that "the balance of program tasks including ... system acceptance and delivery is scheduled to be completed by 15 May 1978." In the January 1978 Production Progress Report, Sperry stated that "[r]eliability demonstration tests have been completed. The balance of program tasks including antenna teardown, design reviews, refurbishment, system acceptance and delivery is scheduled to be completed by 10 March 1978." In a meeting with the government on February 2, 1978, Sperry's program manager requested the government to execute a DD Form 250 upon completion of the "on-site" portion of the physical configuration audit, which was scheduled to occur on February 15, 1978. The government declined to do so.

An inter-office memorandum prepared by Sperry personnel on February 24, 1978, stated that acceptance had not yet oc-

curred. A letter from the contracting officer to Sperry on February 27, 1978, discussed acceptance as a future event. An Engineering Development report issued by Sperry for the period February 1–28, 1978, contained a note stating: "The only remaining program tasks are completion of refurbishment and acceptance of transmitter sites and completion of CDRL data items." The government Production Progress Report for February 1978 stated: "Loran Chain—All program tasks have been completed except for refurbishment and acceptance of transmitter sites which is scheduled to be completed by mid March." A Program Progress Report prepared by Sperry March 13, 1978, stated substantially the same thing.

Finally, in a letter to the government dated April 20, 1978, Sperry stated that "the Loran C/D Ground Chain was formally accepted by the Air Force on March 20, 1978"—the date the DD Form 250 was signed. Although conduct after the dispute arises is not necessarily indicative of the intent of the parties, (*Dynamics Corp. v. United States*, 389 F.2d 424, 182 Ct.Cl. 62 (1968)), this particular statement is consistent with and confirms Sperry's earlier recognition that affirmative action by the government would be necessary for acceptance.

### CONCLUSION

The judgment of the United States Claims Court awarding Sperry damages against the United States is

REVERSED.

BISSELL, Circuit Judge, concurring in result.

The majority decision turns on the proposition that "upon" means "shortly afterward," and that we must so interpret it throughout the contract. Examining the Title and Risk of Loss clause belies this position. That clause states that title to supplies "shall pass to the Government *upon* formal acceptance" (emphasis added). In this clause, it is obvious that "upon" means "at the time of acceptance," and not "shortly afterward."

In my view, a better basis for decision begins with the recognition that the government is widely known to accept contract performance through the execution of the DD250. As the majority acknowledges, ASPR 14–306(b) states that "[a]cceptance shall ordinarily be evidenced by execution" of a DD250. The Title and Risk of Loss clause just noted reveals why such a bright line event is particularly important: the government owns the goods and bears the risk of loss for them once it has accepted them. In light of the normal practice of government acceptance through execution of the DD250, and the policy reasons underlying such a bright line event, I would hold that acceptance occurs only through the execution of the DD250, or similar document, unless the contract *clearly* states otherwise. Although the parties may agree to acceptance by some other means, the subject contract is too loosely worded to hold that Sperry and the government did so here.

I must add that this conclusion does not reflect insensitivity to Sperry's right, as optionor, to protect itself against attempts by the government to enlarge a fixed option period. This case, however, is not about strictly construing the terms of an option agreement. It is about the separate question of how to interpret what this contract means by the term "final acceptance."